******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RANDALL WEISS ET AL. *v.* MICHAEL D.
SMULDERS ET AL.
(SC 19151)
(SC 19158)

Palmer, Zarella, Eveleigh, McDonald and Beach, Js.

*Argued March 19—officially released August 26, 2014*

*Benjamin M. Wattenmaker*, with whom, on the brief, was *John M. Wolfson*, for the appellants in Docket No. SC 19151 and the appellees in Docket No. SC 19158 (plaintiffs).

*Kirk D. Tavtigian*, with whom, on the brief, was *George M. Purtill*, for the appellees in Docket No. SC 19151 and the appellants in Docket No. SC 19158 (defendants).

*Opinion*

McDONALD, J. These appeals arise out of a dispute between two specialty food businesses regarding the scope of their obligations under a distribution agreement and the legal effect of oral promises regarding the formation of a joint venture between the businesses. The plaintiffs, Randall Weiss and his company, Gourmet and Specialty Food Works, LLC (Food Works), commenced this action against the defendants, Michael D. Smulders and his company, Garden of Light Natural Food Markets, Inc. (Garden of Light), seeking to recover money damages for, inter alia, breach of an oral contract and promissory estoppel for failing to form the joint venture. The defendants filed counterclaims asserting, inter alia, that the plaintiffs had breached the parties' written contract by failing to pay for goods purchased. Following a bench trial, the court rendered judgment for the plaintiffs on their promissory estoppel claim against Smulders, but awarded limited damages on the ground that the plaintiffs had not proved the value of their share of the new venture to a reasonable certainty, and rendered judgment for the defendants on their breach of contract counterclaim. The plaintiffs and the defendants filed separate appeals from the judgment.[1] In their appeal, the plaintiffs claim that the trial court improperly: (1) found that the evidence adduced at trial was insufficient to establish their damages with reasonable certainty; (2) reversed its decision to hold a posttrial evidentiary hearing to allow the plaintiffs to present further evidence regarding damages; and (3) rendered judgment for the defendants on their breach of contract counterclaim because the defendants had committed prior material breaches. In their appeal, the defendants claim that the court improperly rendered judgment for the plaintiffs on their promissory estoppel claim because: (1) the plaintiffs lacked standing in light of Weiss' bankruptcy filing; and (2) that claim contradicts the fully integrated distribution agreement. We affirm the judgment of the trial court in all respects.

The trial court reasonably could have found the following facts.[2] Smulders and Weiss had their first business interaction in 2001. At that time, Smulders was the president and sole shareholder of Garden of Light, a company that owned and operated two natural foods grocery stores in Avon and Glastonbury and a bakery that produced natural granola products sold in those stores. Weiss was the owner and operator of Aegean International, an olive oil and balsamic vinegar distribution and marketing company. The business relationship between the two men began when Weiss approached Smulders about selling his olive oil in Garden of Light's Glastonbury store. Smulders agreed, and due to successful sales, Smulders continued to purchase olive oil from Weiss.

In the late spring or early summer of 2003, while

Weiss was visiting the Garden of Light grocery store, Smulders asked Weiss if he thought that Garden of Light's granola could be packaged for wholesale distribution. At that time, the granola products were being sold only in the two Garden of Light grocery stores, and were packed in a plastic bag bearing a plain black and white "scale" label. Weiss responded that, if properly packaged, the product potentially could do well. Smulders acknowledged that he did not have any wholesale marketing experience. He further indicated to Weiss that he would need Weiss' assistance in this area and that he had approached Weiss because of Weiss' olive oil marketing campaign. As a result of this conversation, the interest of both parties was piqued, and they had numerous subsequent conversations in the late spring or early summer of 2003, in which they agreed to work to distribute the granola products.

In or around August, 2003, the parties discussed working together as two separate companies to produce and distribute the granola products. Smulders also indicated that they would merge their companies to form a new enterprise if that relationship proved successful. Shortly thereafter, Weiss formed Food Works to distribute Garden of Light's granola products. In December, 2003, Garden of Light and Food Works executed a written "Master Distributorship Agreement" (distribution agreement), the purpose of which was to designate Food Works the exclusive distributor of granola products produced by Garden of Light. The distribution agreement expressly acknowledged that the parties had entered into discussions with respect to the formation of a new company. Subsequent to the execution of the distribution agreement and until approximately the time their relationship ended in 2006, Smulders made repeated representations to Weiss that he would spin off his bakery business from Garden of Light, merge it with Food Works, and that he and Weiss would be equal partners in the new company, which they referred to as "NEWCO."

In the period that followed the execution of the distribution agreement, Weiss wound down his olive oil business to focus primarily on the granola products business, expending many hours on marketing and research. Weiss also paid a brand manager $14,000 to promote that business. At some point during this period, Weiss and Smulders began labeling the granola products with the trade name Bakery on Main. While Food Works purchased and distributed Garden of Light's granola products, Weiss and Smulders continued to maintain their separate companies.

In September, 2006, Smulders sent an e-mail to Weiss, informing Weiss that he would not merge companies. At the same time, Smulders sent a letter to Weiss, asserting that Food Works was not in compliance with the distribution agreement because it had failed to compensate

Garden of Light for products that had been purchased for distribution. As required by the distribution agreement, Smulders, acting on behalf of Garden of Light, gave Food Works thirty days to cure the breach. Thereafter, Garden of Light continued to fulfill Food Works' orders, as it was bound to do under the distribution agreement, and Food Works' debt continued to accumulate. After Food Works failed to make full payment within the thirty day period, Garden of Light formally terminated the distribution agreement.

The record reveals the following procedural history. The plaintiffs commenced this action against the defendants, alleging in the operative complaint: breach of oral contract and promissory estoppel as to Smulders; breach of written contract as to Garden of Light; and negligent misrepresentation, intentional misrepresentation, and unjust enrichment as to both defendants. The defendants asserted various special defenses and two counterclaims against the plaintiffs, alleging breach of contract and fraudulent misrepresentation.[3]

After the close of evidence, the defendants moved to dismiss the plaintiffs' breach of oral contract count in its entirety and portions of the remaining counts, including the promissory estoppel count, claiming that, because Weiss had filed for bankruptcy protection subsequent to the occurrence of some of the events that constituted the claims, those claims belonged to Weiss' bankruptcy estate, not to the plaintiffs. The trial court denied the motion, determining with respect to the promissory estoppel claim that this claim had not fully accrued in December, 2003, when Weiss filed his bankruptcy petition. In reliance on this finding, the court concluded that the plaintiffs, rather than the bankruptcy trustee, had standing to pursue the claim.

Thereafter, the court found in favor of the defendants on all of the plaintiffs' claims except promissory estoppel.[4] With respect to that claim, the court found that the plaintiffs had met their burden of establishing that Smulders made promises regarding an eventual merger of their two companies and that Weiss acted in reliance on those promises to his detriment. With respect to the defendants' counterclaims, the court found that the defendants had met their burden of establishing that the plaintiffs breached the distribution agreement by failing to compensate Garden of Light for products that the plaintiffs had purchased for distribution, but found in favor of the plaintiffs on the defendants' claim of fraudulent misrepresentation.[5]

With respect to damages, the court awarded the defendants $110,463.50 in principal and interest for the plaintiffs' breach of the distribution agreement. As to the plaintiffs' damages for promissory estoppel, the court found that they were entitled to be compensated as if the companies had merged as promised and for costs expended on the venture that never came to be.

With respect to the latter, the court found that Weiss was entitled to one half of the $14,000 that he had paid to the brand manager to promote the granola products, as he would have benefited from one half of those services as a partner in NEWCO. The court also found that Weiss was entitled to the value of a 50 percent share of NEWCO, but that neither party had offered sufficient evidence to demonstrate the value of NEWCO. In light of this deficiency, the court determined that further evidence of NEWCO's value was necessary and ordered the parties to return to court to present additional evidence on that issue. Subsequently, the defendants moved to reargue the court's decision to hold the additional hearing, and the plaintiffs moved for reconsideration of the court's decision that the plaintiffs had failed to present sufficient evidence of NEWCO's value. The trial court granted the defendants' motion, reversing its decision to allow the parties to introduce additional evidence on damages, and denied the plaintiffs' motion. Thereafter, the plaintiffs and the defendants filed appeals. Additional facts and procedural history will be set forth as necessary.

I

All of the parties raise claims challenging the trial court's judgment with respect to the plaintiffs' promissory estoppel claim—the defendants on the merits and the plaintiffs on damages. The defendants contend that the plaintiffs lacked standing to pursue the promissory estoppel claim because the bankruptcy trustee appointed to oversee Weiss' bankruptcy estate had exclusive standing to pursue the claim. The defendants further contend that, even if the plaintiffs had standing, the court improperly allowed the plaintiffs to recover on this claim because it contradicted the fully integrated distribution agreement. The plaintiffs dispute both of these contentions and argue with respect to damages that the trial court improperly found that the evidence adduced at trial was insufficient to establish the value of NEWCO to a reasonable certainty, and improperly reversed its decision to hold a posttrial evidentiary hearing on damages. We conclude that the plaintiffs had standing to bring their promissory estoppel claim and were not precluded by the terms of the distribution agreement from advancing this claim. Nevertheless, we conclude that the trial court properly determined that the plaintiffs failed to meet their burden of proving their damages with reasonable certainty and properly declined to allow the plaintiffs to present further evidence posttrial.

A

We first turn to the defendants' challenge to the plaintiffs' standing to bring their promissory estoppel claim because that issue implicates the trial court's subject matter jurisdiction. Because of the jurisdictional nature of the claim, it presents a threshold issue that must be

resolved before any determination of the merits. *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 511, 518, 970 A.2d 583 (2009). The defendants argue that the roots of the plaintiffs' promissory estoppel claim arose from prebankruptcy activity. Accordingly, the defendants contend that any cause of action based on a claim of promissory estoppel was property belonging to the bankruptcy estate, and thus the bankruptcy trustee had exclusive standing to pursue that claim. In response, the plaintiffs argue that the trial court properly determined that the date on which the claim accrues controls, and because the promissory estoppel claim accrued after the bankruptcy petition was filed, the claim was the property of Weiss, not the bankruptcy estate. The plaintiffs further contend that, even if this court were to apply the test that the defendants advocate, the plaintiffs still would have had standing under the proper application of that test.[6] We agree with the plaintiffs that they had standing irrespective of which test applies.

The following additional facts found by the trial court and procedural history are relevant to this issue. Between 2003 and 2006, Smulders made several promises to Weiss that they would merge Food Works with the Bakery on Main part of Garden of Light to form the new enterprise known as NEWCO, and that Smulders and Weiss would be equal partners. These promises were made in e-mails sent from Smulders to Weiss dated August 23, 2003, October 28, 2004, and March 17, 2006, and in a memorandum authored by Smulders in 2005, that specifically referenced how and when the two companies would merge into NEWCO.[7] Consistent with these promises, Smulders referred to Weiss as his partner on numerous occasions, including in an e-mail to a potential customer dated April 24, 2005, and in a September, 2005 presentation in which he identified himself and Weiss as "Managing Partners." Until Smulders renounced his intention to merge the companies in September, 2006, Weiss acted in reliance on the promises to merge the two companies by abandoning his olive oil business, spending hundreds of hours on marketing and research that was not required of him under the distribution agreement, and working to improve both his and Smulders' businesses.

During the period when Weiss was working toward the goal of merging the companies, however, he filed a voluntary chapter 7 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut. Specifically, Weiss filed the petition on December 5, 2003, after Smulders had made his initial promise to Weiss, but before the parties had executed the distribution agreement and well before Smulders had repudiated the promised merger of the companies. Weiss did not list the distribution agreement or his interest in NEWCO in his bankruptcy petition.

In considering the standing issue raised in this case, an issue over which we exercise plenary review; *Wilcox* v. *Webster Ins., Inc.*, 294 Conn. 206, 213–14, 982 A.2d 1053 (2009); we first are guided by certain fundamental principles of bankruptcy law. When a debtor files for bankruptcy protection, a bankruptcy estate is created. *Charts* v. *Nationwide Mutual Ins. Co.*, 300 B.R. 552, 556–57 (Bankr. D. Conn. 2003). Title 11 of the United States Code, § 541, prescribes the property interests of the debtor that comprise the bankruptcy estate. Subject to a few exceptions, such property is defined as "all legal or equitable interests of the debtor in property *as of the commencement of the case.*"[8] (Emphasis added.) 11 U.S.C. § 541 (a) (1) (2012). It is well settled that such property includes causes of action possessed by the debtor at that time. See, e.g., *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1101 (2d Cir. 1990); *In re Cottrell*, 876 F.2d 540, 542–43 (6th Cir. 1989); *Sierra Switchboard Co.* v. *Westinghouse Electric Corp.*, 789 F.2d 705, 707–709 (9th Cir. 1986). A bankruptcy debtor does not have standing to pursue claims that constitute property of a bankruptcy estate. *Tilley* v. *Anixter, Inc.*, 332 B.R. 501, 507 (Bankr. D. Conn. 2005); see *Seward* v. *Devine*, 888 F.2d 957, 963 (2d Cir. 1989).

Thus, the ultimate question is whether a cause of action that was instituted postpetition constitutes the property of the debtor *at the time the bankruptcy case has commenced, namely, by the filing of the petition.* The federal courts are split on the proper approach to resolve this question. Some courts, relying on *Butner* v. *United States*, 440 U.S. 48, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979),[9] have determined that applicable state law determines when a cause of action accrues and therefore consider that date in relation to the date on which the petition was filed. See, e.g., *In re Witko*, 374 F.3d 1040, 1043 (11th Cir. 2004) (applying state law to determine whether legal malpractice cause of action had accrued at time debtor filed bankruptcy petition)*; In re Segerstrom*, 247 F.3d 218, 224 (5th Cir. 2001) ("[a] debtor's pre-petition rights in property, such as a cause of action, are determined according to state law")*; In re de Hertogh*, 412 B.R. 24, 29 (Bankr. D. Conn. 2009) ("the [c]ourt's analysis focuses on when [prepetition or postpetition] and to whom [the estate or the postpetition debtor] a legally cognizable interest in the cause of action arose under the applicable state law" [emphasis omitted]). These courts reason that "[a]lthough federal bankruptcy law determines the outer boundary of what may constitute property of the estate, state law determines the nature of a debtor's interest in a given item." (Internal quotation marks omitted.) *In re Crysen/Montenay Energy Co.*, supra, 902 F.2d 1101; *In re de Hertogh*, supra, 29. Therefore, "whereas federal law instructs us that [a cause of action] *may* constitute property of [the debtor's] estate, state law determines whether [the debtor's] interest in the cause of action

is sufficient to confer on the estate a property right in the action." (Emphasis in original.) *In re Crysen/ Montenay Energy Co.*, supra, 1101. The Second Circuit, whose decisions "'carry particularly persuasive weight'" in our resolution of issues of federal law; *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 783, 23 A.3d 1192 (2011); follows this approach. See, e.g., *Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995) ("Whether the rights belong to the debtor . . . is a question of state law. . . . Thus, the trustee stands in the shoes of the debtors, and can only maintain those actions that the debtors could have brought prior to the bankruptcy proceedings." [Citations omitted; internal quotation marks omitted.]); *In re de Hertogh*, supra, 29 (same); see also *In re Crysen/Montenay Energy Co.*, supra, 1101 (state law determines nature of debtor's interest in given item).

Other courts, relying on *Segal* v. *Rochelle*, 382 U.S. 375, 86 S. Ct. 511, 15 L. Ed. 2d 428 (1966),[10] deem the purposes of federal bankruptcy law controlling, namely, to secure for creditors everything of value the debtor may possess in alienable or leviable form when he files his petition, while leaving the debtor free after the petition date to accumulate new wealth in the future. See id., 379–80. These courts consider whether, even if a cause of action accrued postpetition under state law, that action nonetheless was "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start that it should be regarded as property" of the bankruptcy estate. (Internal quotation marks omitted.) Id., 380; see, e.g., *In re Jenkins*, 410 B.R. 182, 191–92 (Bankr. W.D. Va. 2008) (holding that bankruptcy law, not state law, "determines whether a debtor's interest is property of the estate" and, as such, plaintiff's tort claims are sufficiently rooted in prepetition conduct because they "derive *solely* from the conduct of the [d]efendants that took place prior to the commencement of the bankruptcy case" [emphasis in original]); *In re Riccitelli*, 320 B.R. 483, 491–92 (Bankr. D. Mass. 2005) (holding that malpractice claim that accrued postpetition was not "sufficiently rooted in the pre-bankruptcy past" because harm suffered occurred postpetition and was entangled with debtor's ability to have unencumbered fresh start); *Field* v. *Transcontinental Ins. Co.*, 219 B.R. 115, 119 (Bankr. E.D. Va. 1998) (holding that claim for bad faith failure to insure brought against insurance company, which accrued postpetition, was "sufficiently rooted in [the] pre-bankruptcy past" to become part of bankruptcy estate because accident and right to coverage occurred prepetition), aff'd, 173 F.3d 424 (4th Cir. 1999). Under this approach, if the claim has sufficient roots in the prebankruptcy past but does not materially impair the bankrupt's ability to obtain the fresh start intended under bankruptcy law, the claim belongs exclusively to the estate.[11] See *Tyler* v. *DH Capital*

*Management, Inc.*, 736 F.3d 455, 461–62 (6th Cir. 2013); *In re Riccitelli*, supra, 491–92.

Despite this split of authority, we conclude that we need not resolve in the present case which approach is correct because the defendants' claim fails under both approaches. We first apply the approach that looks to applicable state law to determine whether the claim existed as of the petition date. The doctrine of promissory estoppel serves as an alternative basis to enforce a contract in the absence of competing common-law considerations. See *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987); *Torringford Farms Assn., Inc.* v. *Torrington*, 75 Conn. App. 570, 576, 816 A.2d 736, cert. denied, 263 Conn. 924, 823 A.2d 1217 (2003). "The law concerning when a breach of contract action accrues is well settled. This court has stated that [i]n an action for breach of contract . . . the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted." (Internal quotation marks omitted.) *Tolbert* v. *Connecticut General Life Ins. Co.*, 257 Conn. 118, 124, 778 A.2d 1 (2001); see also *Engelman* v. *Connecticut General Life Ins. Co.*, 240 Conn. 287, 294–95 n.7, 690 A.2d 882 (1997) (noting in contract action wherein defendant is claimed to have breached his obligation to pay sum of money, cause of action accrues when defendant fails to pay promised sum). Therefore, it follows that a cause of action for promissory estoppel accrues when the defendant fails to fulfill its promise. See *Torringford Farms Assn., Inc.* v. *Torrington*, supra, 577–78.

As we previously indicated, Weiss filed his petition for bankruptcy on December 5, 2003, and Smulders renounced his promise to merge companies in September, 2006. Therefore, under state law, the plaintiffs' promissory estoppel claim did not accrue until 2006, after Weiss filed for bankruptcy. Indeed, the defendants do not dispute that, under the accrual date approach, the plaintiffs' cause of action premised on a promissory estoppel claim was not property of the bankruptcy estate.

We reach the same conclusion by applying the alternative approach under which federal bankruptcy law controls. The courts taking this approach have indicated that a cause of action does not become property of the bankruptcy estate merely because it has *some* prepetition roots; rather, the facts forming the cause of action determine whether it is sufficiently rooted in the prepetition past. See, e.g., *Tyler* v. *DH Capital Management, Inc.*, supra, 736 F.3d 462 ("pre-petition conduct or facts alone will not 'root' a claim in the past; there must be a pre-petition violation"); *In re de Hertogh*, supra, 412 B.R. 30–31 (holding prepetition roots of malpractice action outweighed by postpetition suffering of harm, thus rendering cause of action debt-

or's property); *In re Jenkins*, supra, 410 B.R. 191 (holding tort claims sufficiently rooted in prepetition conduct because "claims derive *solely* from the conduct of the [d]efendants that took place prior to the commencement of the bankruptcy case" [emphasis in original]); *In re Riccitelli*, supra, 320 B.R. 491–92 (noting negligence claim not sufficiently rooted in prebankruptcy past primarily because harm occurred postpetition as harm resulted from filing of petition). Some courts have strictly construed the test to require that all or most of the facts constituting the cause of action exist at the commencement of the bankruptcy case; see, e.g., *Tyler* v. *DH Capital Management, Inc.*, supra, 462; *In re Jenkins*, supra, 194; *In re Riccitelli*, supra, 491–92; while other courts have applied the test expansively to include contingent and unripe claims as property of the estate. See, e.g., *Fix* v. *First State Bank of Roscoe*, 559 F.3d 803, 809 (8th Cir. 2009) (claims based on breach of promise "have sufficient roots in [debtor's] pre-bankruptcy activities to be considered property of the bankruptcy estate, even though the [b]ank's alleged breach of its promise occurred post-petition"); *In re Parker*, Docket No. 06-8053, 2007 Bankr. LEXIS 1523, *26 (B.A.P. 6th Cir. May 10, 2007) (holding legal malpractice claim became part of estate at time of negligence, not when damages incurred).

Irrespective of whether we construe the test strictly or expansively, however, the result is the same. The trial court found that promissory estoppel arose from Weiss' detrimental reliance on a series of promises and statements made by Smulders between 2003 and 2006. Only one of those communications occurred before the bankruptcy petition was filed—the August, 2003 e-mail. The distribution agreement executed in December, 2003, however, unequivocally reflects that no firm promise to merge the companies had yet been made. That distribution agreement acknowledges that "[t]he parties have entered into *discussions* with respect to the formation of a new company . . . ." (Emphasis added.) Therefore, any promise supporting the promissory estoppel claim occurred after the petition was filed. Similarly, all of Weiss' actions demonstrating detrimental reliance and harm occurred postpetition. Therefore, even under the sufficiently rooted test, it is clear that the plaintiffs' promissory estoppel claim is a postpetition asset that was not property of Weiss' bankruptcy estate because all of the actions supporting the claim occurred subsequent to the date Weiss filed his bankruptcy petition. Accordingly, we conclude that the plaintiffs had standing to pursue their promissory estoppel claim, irrespective of which test applies.

B

We next turn to the defendants' claim that the plaintiffs cannot recover on their promissory estoppel claim because it contradicts the fully integrated distribution

agreement. Specifically, the defendants point to a merger clause in the distribution agreement, and to language therein indicating that any agreement regarding the formation of a new business must be evidenced in writing. As such, the defendants argue that the trial court violated the parol evidence rule by allowing the plaintiffs to prevail on their promissory estoppel claim.[12] In response, the plaintiffs argue that the defendants' claim is unpreserved because they did not object to the introduction of parol evidence at trial or assert that the distribution agreement was fully integrated. The plaintiffs further argue that the defendants' claim nevertheless fails on the merits because the subject matter of Smulders' promise to merge companies did not come within the scope of the distribution agreement. We conclude that, even though the defendants did not directly raise this claim at trial, they are permitted to pursue it on appeal because the trial court addressed this matter. See Practice Book § 60-5 ("[an appellate] court shall not be bound to consider a claim unless it was distinctly raised at the trial or *arose subsequent to the trial*" [emphasis added]); *Azia* v. *DiLascia*, 64 Conn. App. 540, 558–59 n.13, 780 A.2d 992 (addressing issue on appeal that arose for first time in trial court's memorandum of decision), cert. denied, 258 Conn. 914, 782 A.2d 1241 (2001). We further conclude that the trial court properly admitted evidence in support of the plaintiffs' promissory estoppel claim because Smulders' promise did not vary or contradict the subject matter of the distribution agreement.

"[T]he parol evidence rule is not an exclusionary rule of evidence . . . but a rule of substantive contract law . . . to which we afford plenary review." (Internal quotation marks omitted.) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, 269 Conn. 599, 609, 849 A.2d 804 (2004); *Ravenswood Construction, LLC* v. *F. L. Merritt, Inc.*, 105 Conn. App. 7, 14, 936 A.2d 679 (2007). "The rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages . . . in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 277, 819 A.2d 773 (2003). "Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement. *Tempo Shain Corp.* v. *Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997)." (Internal quotation marks omit-

ted.) *Western Dermatology Consultants, P.C.* v. *VitalWorks, Inc.*, 146 Conn. App. 169, 191, 78 A.3d 167 (2013).

"The parol evidence rule does not of itself, therefore, forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant . . . to prove [inter alia] a collateral oral agreement which does not vary the terms of the writing . . . ." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, supra, 263 Conn. 277; see also *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 503 n.14, 746 A.2d 1277 (2000) (proof of integrated agreement does not bar proof of collateral oral agreement that does not vary terms of writing); 2 Restatement (Second), Contracts § 213 (2), p. 129 (1981) ("[a] binding completely integrated agreement discharges prior agreements to the extent that they are within its scope").

With these principles in mind, we turn to the language contained in the distribution agreement. The preface to the distribution agreement sets forth several recital provisions, including the following: "This Master Distribution Agreement . . . is made and entered into . . . with reference to the following facts . . .

"2. The parties have entered into discussions with respect to the formation of a new company, joint venture or other similar arrangement which would replace the business arrangement detailed in this [a]greement;

"3. Unless and until the above-described arrangement has been finalized and evidenced by written agreement(s), [Garden of Light] wishes to appoint [Food Works] as its exclusive distributor for the sale of Products under the Marks to Dealers in the Territory (as such terms are hereinafter defined) . . . ."

Following the recitations, the distribution agreement then provides: "THEREFORE, [Garden of Light] and [Food Works] hereby agree as follows . . . ." The distribution agreement then prescribes substantive terms of the agreement, including, among others, the grant of a distributorship to Food Works, Food Works' general obligations, Garden of Light's general obligations, prices and terms of payment, the duration of the agreement, and termination. One such term is a merger clause, which provides in relevant part: "This [a]greement contains all of the terms and conditions

agreed upon by the parties hereto *with reference to the subject matter hereof.* No other agreements, oral or otherwise, shall be deemed to exist or to bind either of the parties hereto, and all prior agreements and understandings are superseded hereby. . . ." (Emphasis added.)

We conclude that, even if the distribution agreement is fully integrated, the defendants' claim fails because an examination of the distribution agreement clearly indicates that the evidence admitted at trial to prove that Smulders promised Weiss that they would merge companies to form NEWCO is collateral to the subject matter of the distribution agreement. The subject matter of the distribution agreement is Food Works' purchase and distribution of Garden of Light's products, not the formation of NEWCO. Cf. *Perricone* v. *Perricone*, 292 Conn. 187, 196, 972 A.2d 666 (2009) (holding confidentiality agreement collateral to separation agreement because "relevant subject matter of the separation agreement was the *division of property* between the parties, while the subject matter of the confidentiality agreement was the *disclosure of information* concerning the parties' property and the parties themselves" [emphasis in original]); *Shelton Yacht & Cabana Club, Inc.* v. *Suto*, 150 Conn. 251, 257, 259–60, 188 A.2d 493 (1963) (holding that although written and unwritten contracts related to advertising and promotion of defendant's clubs, unwritten contracts are collateral to written contracts because written contracts concern promise to advertise, promote, and sell memberships to defendant's clubs, while unwritten contracts concerned expenses paid and incurred by plaintiffs in promoting clubs, therefore exceeding scope of written contracts). All of the substantive rights and obligations under the distribution agreement pertain to that distribution agreement. There is no provision in the distribution agreement addressing the parameters under which NEWCO would be created or the parties' obligations upon the creation of NEWCO. Indeed, the trial court's finding that the distribution agreement merely pertained to the distribution relationship is wholly consistent with the title of the agreement— "Master Distributorship Agreement"—and the obligations imposed thereunder.

The only reference to the future formation of the new company is in the recital provisions. The related language in the recital on which the defendants rely that addresses the new venture being "finalized and evidenced by written agreement(s)," however, appears to conflict with substantive provisions of the distribution agreement. Specifically, the recital indicates that Food Works will continue as distributor unless and until a new company or joint venture has been finalized. The substantive provision pertaining to the duration of the contract states that the agreement is to last for three years from the date of execution "[u]nless sooner termi-

nated in accordance with the provisions of [a]rticle 9 [Termination]." Article 9 enumerates specific grounds on which either party may terminate the agreement, none of which includes the formation of NEWCO or any other joint venture. Any conflict between the recital provisions and the substantive terms of the distribution agreement is resolved by the fact that the subject matter of the distribution agreement is the distribution relationship between the parties. As such, the substantive provisions regarding the duration and termination of that matter necessarily would control over what is evidently a collateral matter.[13] See *McKinnon* v. *Baker*, 220 Neb. 314, 317, 370 N.W.2d 492 (1985) (noting well settled principle that "[i]f both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part must control" [internal quotation marks omitted]); see also *Jamison* v. *Franklin Life Ins. Co.*, 60 Ariz. 308, 317, 136 P.2d 265 (1943) (same); *Williams* v. *Barkley*, 165 N.Y. 48, 57, 58 N.E. 765 (1900) (same). In light of these considerations, it is apparent that the formation of NEWCO was collateral to the subject matter of the distribution agreement. Therefore, the trial court properly admitted evidence to prove Smulders' promises to Weiss because such evidence did not vary the terms of the writing contained in the distribution agreement.

C

Having disposed of the defendants' appeal contesting the merits of the plaintiffs' promissory estoppel claim, we turn to the plaintiffs' claims in their appeal regarding damages on that claim. The plaintiffs contend that the trial court improperly concluded that they failed to prove the value of the merged company with reasonable certainty because their expert was entitled to rely on reasonable assumptions in assigning a valuation to NEWCO. In response, the defendants argue that the trial court properly decided that the plaintiffs had failed to prove the value of NEWCO because they valued the wrong entity during the wrong time period. We conclude that the plaintiffs failed to meet their burden because they did not produce evidence valuing a company that is substantially similar to what NEWCO would have been to form a comparative basis on which to prove damages.

The legal principles that govern our review of damage awards are well established. "It is axiomatic that the burden of proving damages is on the party claiming them. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, 302 Conn. 494, 510, 28 A.3d 976 (2011); *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 689, 697 A.2d 1137 (1997). "[T]he court must have evidence by which it can calculate the damages,

which is not merely subjective or speculative . . . but which allows for some objective ascertainment of the amount. . . . This certainly does not mean that mathematical exactitude is a precondition to an award of damages, but we do require that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation [that] will enable the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, supra, 510–11; *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, 193 Conn. 208, 226 n.22, 477 A.2d 988 (1984); accord *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 70, 717 A.2d 724 (1998); *Simone Corp.* v. *Connecticut Light & Power Co.*, 187 Conn. 487, 495, 446 A.2d 1071 (1982). "Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion." (Internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, supra, 511; *Viejas Band of Kumeyaay Indians* v. *Lorinsky*, 116 Conn. App. 144, 163, 976 A.2d 723 (2009). The trial court's determination that damages have not been proved to a reasonable certainty is reviewed under a clearly erroneous standard. See *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 780, 43 A.3d 567 (2012).

The record reveals the following relevant facts. To demonstrate damages in support of their claim of promissory estoppel, the plaintiffs proffered expert testimony from Richard A. Royston, a forensic accountant, and a report prepared by Royston. Royston testified that he had been asked by the plaintiffs to perform an appraisal of the value of Garden of Light and to calculate a valuation of a 50 percent share of the company on as late a date as possible. Royston's calculation was premised on the company's value as of December 31, 2008. To value Garden of Light, Royston used the capitalization of earnings methodology, which values an entity by its sales and profits and does not take physical assets into account. See *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 329, 514 A.2d 734 (1986) ("[w]hile there are several different methods by which to determine the value of a closely-held corporation, these methods, and their variants, are of two general types: [1] capitalization of earnings, or the net present value of a future income stream; and [2] net asset value, or the present sale price of the business assets less its liabilities").

Royston derived his valuation determination by first examining Garden of Light's gross sales and profits, as stated in its federal income tax returns from 2003 to 2008. Royston testified that he had observed a sharp increase in Garden of Light's sales from 2006 to 2008, in which the annual sales almost doubled, and that he focused on that increase in carrying out his valuation. He also stated that there was a corresponding increase

in gross profits as well. Royston then made two deductions in the company's value: to account for its marketability; and to address the fact that there would be a lack of control of the company due to the nonmajority 50 percent share that Weiss expected he would obtain. Taking all of the information into account, Royston opined that the market value of Garden of Light in its entirety was $720,000, and thus a 50 percent share would be valued at $360,000.

Royston further testified that he had requested information from Smulders and Weiss to segregate the grocery store operations of Garden of Light from the granola products of Bakery on Main, but neither Weiss nor Smulders had such information. He testified that he used the capitalization of earnings methodology because he was unable to distinguish between the income of the grocery stores and the income of Bakery on Main, and thus was unable to come up with a comparable peer group of companies to compare with NEWCO in order to extrapolate its value, which would have been an alternative market-based method of valuing NEWCO.

On cross-examination, Royston testified that he did not take Weiss' bankruptcy into account in valuing Garden of Light and that Weiss' poor credit could have had an impact on NEWCO's ability to take out future loans. Royston further admitted that, although he understood that NEWCO would be comprised of the Bakery on Main division of Garden of Light and Food Works, he did not value the merged entity. Further, Royston stated that he was not given any financial data for Food Works, nor did he value that company. He also admitted that to perform a valuation of NEWCO, it would have been extremely helpful to have the value of Food Works and the value of Bakery on Main, rather than the value of Garden of Light in its entirety. Although Royston did not value Bakery on Main separately, he opined that the grocery stores were not a material part of Garden of Light's value. In support of this conclusion, Royston pointed to three facts: a sharp increase in marketing expenses that he attributed to Bakery on Main; a twofold increase in Garden of Light's business between 2006 and 2007; and the arrival of a competing natural foods store in 2008. Royston reasoned that the volume of business at one of the grocery store locations was downtrending due to the competition and, therefore, the increase in Garden of Light's business was due to Bakery on Main's granola business rather than the grocery stores.

In its memorandum of decision, the trial court found that there was insufficient evidence to demonstrate the value of NEWCO. The court agreed with the defendants that Royston's valuation was flawed because it did not measure the value of NEWCO, which was to consist of Food Works and Bakery on Main. The court first

determined that the value of the merged company likely would be different than the value of Garden of Light. The court reasoned that Garden of Light included two grocery stores that were not intended to be included in NEWCO. Therefore, the court determined that any value those stores contributed or detracted from the $720,000 valuation should not have been considered in the calculation of damages. The court also pointed to the following factors that were not accounted for in that valuation by Royston's own admission: Weiss' participation as a co-owner of NEWCO would have likely lessened the value of NEWCO based on his poor credit; and the value of Food Works, for which no evidence had been produced, would need to be measured and included in the value of NEWCO.

Applying the aforementioned damages principles to the facts in the present case, we conclude that, for precisely the reasons identified by the trial court, the evidence presented at trial was inadequate to establish the value of NEWCO with as much reasonable certainty as the case permitted. The plaintiffs contend, however, that they may prove their damages by comparing the value of a comparable business, which they did when they valued Garden of Light. Although this court has approved evidence of a similar business as probative on the issue of lost profits of a business that never came to fruition; see *Cheryl Terry Enterprises, Ltd.* v. *Hartford,* 270 Conn. 619, 655, 854 A.2d 1066 (2004); *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin,* supra, 247 Conn. 73; we have emphasized that "[t]he underlying requirement for [this type] of evidence is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed." *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin,* supra, 74. As such, the plaintiffs had the burden of establishing that Garden of Light and NEWCO were substantially similar companies.

There are two readily apparent deficiencies in the plaintiffs' evidence: (1) the value of Garden of Light included the sales and profits of the two grocery stores that would not be part of NEWCO; and (2) the value of Garden of Light did not include the value of Food Works, which would be part of NEWCO. Royston acknowledged that he would need to account for both of these facts to properly determine the value of NEWCO. Thus, although a damages theory may be based on assumptions, those assumptions must be reasonable in light of the record evidence. Id., 70. A simple measurement of a different, albeit related, company is not enough for the court to make a reasonable estimation of the value of a 50 percent share of NEWCO when there were significant differences between Garden of Light and NEWCO.

Although Royston testified on cross-examination that

Garden of Light's two grocery stores were not a material part of the company, he did not provide the court with sufficient, credible evidence to support this conclusion. Royston assumed that Garden of Light's drastic increase in profits between 2006 and 2008 was due to Bakery on Main's success because the company's marketing expenses were higher than in previous years and because a new competing grocery store opened in 2008. Correlation, however, is not causation. More fundamentally, even if that increase could be attributable solely to Bakery on Main that fact does not account for what portion of Garden of Light's value prior to this increase was attributable to the grocery stores. Accordingly, the plaintiffs did not "lay a foundation [that would] enable the trier to make a fair and reasonable estimate" of the damages. (Internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, supra, 302 Conn. 511.

Nonetheless, the plaintiffs argue that the evidence is reasonable in light of the fact that Royston testified that he had asked for information that would allow him to separate the sales of the two grocery stores from Bakery on Main, but was unable to obtain such information. We reject this argument for two reasons. First, during his testimony, Royston repeatedly stated that he was engaged to value Garden of Light, not an entity comprised of Food Works and Bakery on Main. Indeed, the plaintiffs do not claim that they made any attempt to gather such evidence from the defendants, other than pointing to Royston's statement at trial. Second, even if we were to excuse the plaintiffs from offering more definite proof by virtue of the defendants' failure to provide Royston with such information, the plaintiffs nevertheless failed to take into account the value of Food Works. Royston testified that he did not have any knowledge of Food Works' sales and profits for any point during the relevant time period and that he could not opine on the value of the company. Although Royston opined that Food Works' value in 2006 would not impact his valuation of Garden of Light in 2008, assuming that Food Works had no assets and that all of its customers and sales were absorbed by Garden of Light, this assumption appears to be pure speculation as it was not supported by any objective facts, figures, or data, nor was there any testimony to the effect that such data were not available. Therefore, the plaintiffs' failure to produce evidence of the value of Food Works, which we must assume was readily available to them, requires us to conclude that they have not met their burden of establishing the value of NEWCO with reasonable certainty.

Finally, the plaintiffs cite an Appellate Court case for the proposition that doubts as to exact amounts of damages are generally resolved against the parties in breach and thus any uncertainty in their damages calculation should be resolved against the defendants. See

*Message Center Management, Inc.* v. *Shell Oil Products Co.*, 85 Conn. App. 401, 413, 857 A.2d 936 (2004). This principle may only be invoked, however, once the plaintiffs have demonstrated the amount of damages with reasonable certainty, which the plaintiffs have failed to do. See 3 Restatement (Second), Contracts § 352, comment (a), pp. 144–45 (1981) (noting while doubts in amount of damages are resolved against party in breach, to prevent windfalls plaintiff must still prove amount with reasonable certainty). In light of the aforementioned considerations, we conclude that the trial court's finding that the plaintiffs failed to prove their damages with reasonable certainty with respect to the value of NEWCO was not clearly erroneous.[14]

### D

In light of our conclusion in part I C of this opinion as to the evidentiary deficiency, we must address the plaintiffs' claim that the trial court improperly granted the defendants' motion for reargument and reversed its decision to hold a posttrial evidentiary hearing on damages.[15] Specifically, the plaintiffs claim that the trial court improperly relied on the fact that the case had been pending for five years before trial in the absence of a finding that the alleged delay was the plaintiffs' fault, and failed to consider that its decision would have the effect of precluding the plaintiffs from providing the court with a sufficient basis on which to award damages. We disagree.

We review the trial court's decision to not reopen evidence for a hearing on damages under the abuse of discretion standard. See, e.g., *Wood* v. *Bridgeport*, 216 Conn. 604, 606, 583 A.2d 124 (1990) ("[w]hether . . . a trial court will permit further evidence to be offered after the close of testimony in a case is a matter resting in the sound discretion of the court" [internal quotation marks omitted]). Similarly, we review the adjudication of a motion to reargue for an abuse of discretion. See *Liberti* v. *Liberti*, 132 Conn. App. 869, 874, 37 A.3d 166 (2012). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 698, 41 A.3d 1013 (2012).

The plaintiffs' claim merits little discussion. We do not construe the trial court's decision as punishing the plaintiffs for delaying the commencement of trial. Rather, the court simply determined that the plaintiffs had ample opportunity to obtain evidence, through discovery or otherwise, pertaining to their alleged damages in the years preceding the trial. The court was entitled to presume that the plaintiffs were prepared to present their case when trial commenced. The plaintiffs did not

request a continuance or seek sanctions due to the defendants' failure to comply with discovery requests to obtain evidence relating to valuation. Indeed, the trial court sua sponte ordered further evidentiary proceedings after the close of evidence. When a party has been afforded ample opportunity to obtain and present evidence, a trial court acts well within its discretion to decline to allow that party to obtain a conclusive ruling as to whether the evidence presented satisfied the party's burden of proof, and then to reopen the evidentiary portion of the trial in order to present further evidence if the ruling is adverse. Accordingly, given the facts and circumstances of this case, we cannot conclude that the trial court abused its discretion in granting the defendants' motion to reargue and reversing its sua sponte decision to hold a posttrial evidentiary hearing on damages.

## II

Finally, we turn to the plaintiffs' claim that the trial court improperly rendered judgment for the defendants on their breach of contract counterclaim due to Food Works' failure to pay for certain granola products received from Garden of Light. The plaintiffs contend that they were discharged from their obligations because the defendants committed prior material breaches of the distribution agreement. Specifically, they argue that they presented evidence that the defendants had made direct sales to customers outside of the Garden of Light stores in breach of the provisions in the distribution agreement under which Food Works was deemed the sole distributor of Bakery on Main products and Garden of Light was afforded the limited right to sell such products only in direct sales in its two stores. The evidence indicated that Garden of Light had made approximately $10,000 in direct sales of its products to customers over the Internet, but refused to share the revenue generated with Food Works.[16] In response, the defendants argue that the plaintiffs were not discharged from their obligations under the distribution agreement because: (1) the alleged breaches were not material; and (2) the plaintiffs failed to give written notice to the defendants of these alleged breaches as required by the distribution agreement.[17] With respect to the latter, the defendants point to the trial court's rejection of the plaintiffs' breach of contract claim on the basis of its finding that the plaintiffs had failed to abide by the terms of the distribution agreement for notification of breach. We conclude that, even if the defendants' alleged breaches were material, the plaintiffs' failure to notify the defendants of the breaches and to provide them with an opportunity to cure them in accordance with the provisions of the distribution agreement precludes them from raising this defense.

Under contract law, it is well settled that a material breach by one party discharges the other party's subse-

quent duty to perform on the contract. See *Bernstein* v. *Nemeyer*, 213 Conn. 665, 672–73, 570 A.2d 164 (1990); see also *Vesce* v. *Lee*, 185 Conn. 328, 334, 441 A.2d 556 (1981); 2 Restatement (Second), supra, § 237 ("it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time"). Whether a breach is material depends on the circumstances of the case. *669 Atlantic Street Associates* v. *Atlantic-Rockland Stamford Associates*, 43 Conn. App. 113, 128, 682 A.2d 572 (1996). In addition to considering the multifactor standards for materiality of breach contained in § 241 of the Restatement (Second) of Contracts to assess whether a party's uncured failure to render or to offer performance discharges the other party's remaining duties to render performance, the Restatement (Second) of Contracts notes: "The reasonableness of the injured party's conduct in communicating his grievances and in seeking satisfaction is a factor to be considered in this connection." 2 Restatement (Second), supra, § 242, comment (b), p. 245.

The distribution agreement unambiguously states that if either party wishes to terminate the agreement upon the default of the other party, it must notify the breaching party and provide that party with thirty days to cure such default.[18] At trial, Weiss admitted in his testimony that he had not notified Smulders of the alleged breaches by Garden of Light because he did not want to harm their relationship. In reliance upon this fact, the trial court held that the plaintiffs could not succeed on their claim for breach of the agreement because they had failed to abide by the terms of the distribution agreement. "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Office of Labor Relations* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 288 Conn. 223, 231–32, 951 A.2d 1249 (2008). Therefore, the plaintiffs waived their right to assert a material breach of contract in defense of the defendants' counterclaim when they failed to notify the defendants of the alleged breaches and failed to provide them with an opportunity to cure such breaches. In light of this conclusion, we need not reach the issue of whether the defendants' alleged breaches were in fact material.[19]

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The parties appealed to the Appellate Court, and we transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Although the defendants originally filed a cross appeal to the Appellate Court, this court, subsequent to the transfer of the appeals, issued an order that the cross appeal would be treated as a direct appeal.

[2] The trial court, in its memorandum of decision, relied on certain testimony in its recitation of the background of the case, without expressly indicating which testimony it found credible, except with respect to limited

findings in connection with its resolution of various claims. Accordingly, we read the record in the light most favorable to sustaining the trial court's judgment. See *Smith* v. *Greenwich*, 278 Conn. 428, 440–41, 899 A.2d 563 (2006); *Reyes* v. *Chetta*, 143 Conn. App. 758, 764–65, 71 A.3d 1255 (2013).

[3] We note that, at common law, fraudulent misrepresentation and intentional misrepresentation are the same tort. *Kramer* v. *Petisi*, 285 Conn. 674, 684 n.9, 940 A.2d 800 (2008).

[4] The court found that the plaintiffs failed to provide sufficient evidence to demonstrate that there was a meeting of the minds as to the clear and definite terms of the merging of the parties' companies and therefore rejected the plaintiffs' breach of oral contract claim. The court found that the plaintiffs failed to provide sufficient evidence to demonstrate that Smulders knew or should have known that his representations to Weiss regarding the merging of the companies were false when he made them, i.e., that the merger would not occur, and therefore rejected the plaintiffs' negligent misrepresentation claim. The court rejected the plaintiffs' intentional misrepresentation claim because it found that the plaintiffs did not provide sufficient evidence to demonstrate by clear, precise, and unequivocal evidence that the defendants uttered a false statement that was untrue and known to be untrue. The court rejected the plaintiffs' breach of written contract claim because it found that the plaintiffs failed to inform Garden of Light of the alleged breach and to provide it with thirty days to cure such breach as required by the distribution agreement. Finally, the court rejected the plaintiffs' unjust enrichment claim in light of its judgment in favor of the plaintiffs on their promissory estoppel claim.

[5] The court found that the defendants had not demonstrated by clear, precise, and unequivocal evidence that Weiss intentionally misled the defendants as to his financial condition with respect to his bankruptcy.

[6] The plaintiffs further argue that the trial court's judgment may be affirmed on the alternative ground that Weiss' promissory estoppel claim does not belong to the bankruptcy estate because it is based on personal services performed by Weiss after he filed for bankruptcy. In light of our conclusion that the plaintiffs have standing even if the claim is deemed property, we need not reach this alternative ground for affirmance.

[7] As we explain later in this part of the opinion, the August, 2003 e-mail, in and of itself, could not be construed as containing a firm promise to merge the companies.

[8] The estate also includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541 (a) (7) (2012). The federal courts have reached inconsistent results in determining whether causes of actions that accrued after the bankruptcy petition has been filed but during the pendency of the bankruptcy case were "acquired" by the estate or remained property of the debtor. Compare *Correll* v. *Equifax Check Services, Inc.*, 234 B.R. 8, 11 (Bankr. D. Conn. 1997) (holding Fair Debt Collection Practices Act cause of action arising out of letters received by debtor postpetition but prior to discharge and close of bankruptcy case constituted property of estate), with *In re Durrett*, 187 B.R. 413, 417–19 (Bankr. D.N.H. 1995) (holding that personal injury action arising out of postpetition airplane accident did not become part of bankruptcy estate); *In re Doemling*, 127 B.R. 954, 955–56 (Bankr. W.D. Pa. 1991) (holding that personal injury action arising out of postpetition automobile accident did not become part of bankruptcy estate). In the present case, neither party argues that Weiss' bankruptcy estate acquired the promissory estoppel claim after the commencement of the case pursuant to 11 U.S.C. § 541 (a) (7). As such, we need not consider it. We note, however, that, according to Weiss' bankruptcy docket, his case closed on March 29, 2004. Therefore, Weiss' case closed prior to the occurrence of all of the conduct constituting the plaintiffs' promissory estoppel claim, with the exception of Smulders' initial August, 2003 e-mail.

[9] *Butner* arose out of a dispute between a bankruptcy trustee and a second mortgagee over the right to the rents collected during the mortgagor's bankruptcy case. *Butner* v. *United States*, supra, 440 U.S. 50. The lower courts had disagreed whether the bankruptcy court's adjudication of the debtor as bankrupt had terminated the receivership that the debtor had previously established to collect rents, thus requiring the debtor to make a new request during the bankruptcy case for the appointment of a receiver. Id., 50–51. The United States Supreme Court specifically noted that it "did not grant certiorari to decide whether the Court of Appeals correctly applied [the state] law." Id., 51. Rather, the sole issue before the Supreme Court was whether state law or a federal rule of equity should govern the issue. Id.,

52–53. The Supreme Court held that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." Id., 55.

[10] In S*egal*, the United States Supreme Court addressed whether loss-carryback tax refunds were property of the bankruptcy estate under the predecessor to 11 U.S.C. § 541 (a) (1), when the refunds were sought and obtained after the debtors had filed for bankruptcy, but the losses constituting the refunds had been suffered prior to the date the debtors filed their petition. S*egal* v. *Rochelle*, supra, 382 U.S. 376–77. The court noted that, under the version of the bankruptcy statutory scheme then in effect, the bankruptcy estate included "property . . . which prior to the filing of the petition . . . [the debtor] could by any means have transferred." (Internal quotation marks omitted.) Id., 377. Relying on the purposes and policies of the then current bankruptcy scheme; id., 379; the Supreme Court held that the debtors' loss-carryback refund claim "is sufficiently rooted in the prebankruptcy past and so little entangled with the [debtors'] ability to make an unencumbered fresh start that it should be regarded as 'property' under [our bankruptcy law]." Id., 380. The Supreme Court contrasted future wages or expected bequests, even though those might be transferable under state law, because they would nonetheless not be called property within the meaning of the bankruptcy provisions then in effect as that would defeat the fresh start policy embodied in the bankruptcy discharge. Id., 379–80.

[11] We note that there is a debate among the federal courts as to whether the sufficiently rooted test of *Segal* survived the enactment of the Bankruptcy Reform Act of 1978, which replaced the Bankruptcy Act of 1898 with the current Bankruptcy Code. Compare *In re Burgess*, 438 F.3d 493, 498–99 (5th Cir. 2006) (noting sufficiently rooted test did not survive enactment of Bankruptcy Code because 11 U.S.C. § 541 expressly defines property of bankruptcy estate and former § 70a [5] of Bankruptcy Act did not); *In re Rhinesmith*, 450 B.R. 630, 632–33 n.1 (Bankr. W.D. Tex. 2011) (same), with *In re Feiler*, 218 F.3d 948, 955–56 (9th Cir. 2000) (noting Congress affirmatively adopted *Segal* holding when it enacted current Bankruptcy Code because legislative history states that "[t]he result of *Segal* . . . is followed, and the right to a refund is property of the estate" [internal quotation marks omitted]); see also *In re Andrews*, 80 F.3d 906, 910 n.9 (4th Cir. 1996) (result of *Segal* remains valid under current Bankruptcy Code). In light of our conclusion that the plaintiffs had standing to pursue their promissory estoppel claim irrespective of which test applies, we do not weigh in on this debate.

[12] In the section of their brief addressing this claim, the defendants also asserted a distinct claim that a statement of intent to enter into a contract in the future cannot form the basis of a promissory estoppel claim. According to the defendants, Smulders' discussions with Weiss were statements of intent to enter into a contract in the future. Our review of the defendants' answer and posttrial brief reveal that they did not raise this issue at trial. Moreover, the defendants failed to identify this claim as an issue for our review in their preliminary statement of the issues; see Practice Book § 67-4 (a); and failed to set forth a standard of review for this claim. See Practice Book § 67-4 (d). Accordingly, we decline to address this claim. See Practice Book § 60-5; see also *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 82, 848 A.2d 395 (2004); *Bell Atlantic Mobile, Inc.* v. *Dept. of Public Utility Control*, 253 Conn. 453, 485, 754 A.2d 128 (2000).

[13] The plaintiffs cite an Appellate Court case that recognized that "[r]ecitals in a contract, such as whereas clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations unless referred to in the operative provisions of the contract." (Internal quotation marks omitted.) *DeMorais* v. *Wisniowski*, 81 Conn. App. 595, 610, 841 A.2d 226, cert. denied, 268 Conn. 923, 848 A.2d 472 (2004); id., 610–11 (citing authority from other jurisdictions recognizing principle). Our research also reveals that other jurisdictions have held that although recitals do not control over the substantive provisions of a contract, they may be read in conjunction with those provisions to ascertain the parties' intention, particularly where the substantive provisions are ambiguous. See, e.g., *Aramony* v. *United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001) ("we have held that although a statement in a whereas clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document" [internal quotation marks omitted]); *Stowers* v. *Community Medical Center, Inc.*, 340 Mont. 116, 121, 172 P.3d 1252 (2007) ("while 'whereas' clauses

cannot be permitted to control over the express provisions of a contract, they are to be read in conjunction with the operative portions of the contract in order to ascertain the intention of the parties"); *McKinnon* v. *Baker*, 220 Neb. 314, 317, 370 N.W.2d 492 (1985) ("[Recitals] are generally background statements and do not ordinarily form any part of the real agreement. If the agreement proper is ambiguous, then the recitals may be of value in construing the same."). In light of our conclusion that the formation of NEWCO is collateral to the subject matter of the distribution agreement, and because the substantive provisions do not refer to the particular language in the recitals nor is the language of the distribution agreement ambiguous, we need not analyze or adopt any of these additional rules.

[14] In light of our conclusion that the plaintiffs failed to meet their burden because the valuation of Garden of Light included its two grocery stores and excluded the value of Food Works, we do not address the plaintiffs' argument that the trial court improperly found that Weiss' participation as a co-owner of NEWCO would likely have lessened its value as we do not rely on that factor. Similarly, in light of our conclusion, we need not address the defendants' argument that the plaintiffs presented improper evidence of the value of NEWCO by including sales and profits of Garden of Light from the time period of 2006 through 2008, after Smulders had breached his promise to Weiss.

[15] In their motion for reargument, the defendants contended both that the trial court lacked authority to reopen the evidence and that they would be prejudiced by a reopening of the evidence. The trial court did not address either argument specifically, and the defendants have not argued in their brief to this court as an alternative ground to affirm the trial court's decision that it lacked authority to reopen the evidence. Therefore, we do not address this issue.

[16] The plaintiffs also contend that the defendants made approximately $100 of sales in person outside of its stores. These sales must be deemed de minimis by any standard, and therefore we do not consider them.

[17] Additionally, the defendants argue that this claim is barred because the plaintiffs did not plead prior material breach as a separate special defense as required by Practice Book § 10-50. The defendants have raised this claim for the first time on appeal. In light of well settled law that "the failure to file a special defense may be treated as waived when no objection has been raised to the offer of evidence on the issue"; *Pepe* v. *New Britain*, 203 Conn. 281, 286, 524 A.2d 629 (1987); see also *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 273, 819 A.2d 773 (2003); it is evident that the defendants are not entitled to review of this issue on appeal.

[18] The distribution agreement provides in relevant part: "[E]ither party may terminate this [a]greement for failure by the other party to perform or adhere to any of its obligations under this [a]greement by notifying the other party of such default and allowing the other party thirty (30) days within which to cure such default."

[19] The plaintiffs further claim that the trial court improperly rendered judgment for the defendants on their breach of contract counterclaim because the defendants had unclean hands, arguing that: (1) in rendering judgment for the plaintiffs on their promissory estoppel claim, the trial court found that Smulders had induced Weiss to make significant sacrifices for the benefit of Garden of Light in reliance on Smulders' promise to merge companies; and (2) Garden of Light repeatedly breached the distribution agreement by making direct sales to customers. We reject the plaintiffs' argument for two reasons. First, the equitable defense of unclean hands bars only equitable relief. See, e.g., *Thompson* v. *Orcutt*, 257 Conn. 301, 308, 777 A.2d 670 (2001); *Eldridge* v. *Eldridge*, 244 Conn. 523, 536, 710 A.2d 757 (1998); *DeCecco* v. *Beach*, 174 Conn. 29, 34, 381 A.2d 543 (1977). The defendants sought a legal remedy in the form of money damages for their breach of contract counterclaim. Second, the plaintiffs have not demonstrated on the record that the defendants engaged in "wilful misconduct . . . so as to invoke the equitable maxim as claimed." *DeCecco* v. *Beach*, supra, 35; see also *A & B Auto Salvage, Inc.* v. *Zoning Board of Appeals*, 189 Conn. 573, 578, 456 A.2d 1187 (1983). Indeed, Smulders testified that he would have cured a breach had he been notified of one. Accordingly, the trial court did not abuse its discretion in rejecting the plaintiffs' defense. See *Thompson* v. *Orcutt*, supra, 308 (noting application of unclean hands doctrine rests within sound discretion of trial court).