ESTUARDO REYES ET AL. *v.* NICHOLAS
CHETTA ET AL.
(AC 34730)

Beach, Sheldon and Bishop, Js.

---

Argued March 12—officially released July 2, 2013

*Frederick J. Martin,* for the appellant (defendant Michael Amoroso).

*Jason P. Gladstone,* for the appellees (plaintiffs).

*Opinion*

SHELDON, J. This action involves a claim of tortious interference with a business relationship or expectancy arising under successive contracts for the purchase and sale of a landscaping and snow removal business, first from the defendant Michael Amoroso to the defendant Nicholas Chetta,[1] and then from Chetta to the plaintiff Estuardo Reyes.[2] Amoroso appeals from the judgment of the trial court awarding damages to Reyes in the amount of $50,000 and prejudgment interest in the amount of $20,383.57. We reverse the judgment as to the court's award of prejudgment interest, but affirm the judgment in all other respects.

The facts of this case are largely undisputed. For six years, Amoroso owned and operated a landscaping and snow removal business known as Down 2 Earth Lawn Care, LLC (business). On August 27, 2007, Amoroso entered into an agreement to sell the entire business, then consisting of eighty-nine landscaping accounts, fifty-nine snow plowing accounts and certain equipment, to Chetta. The agreement, which contained a complete list of the business' accounts, including the name and address of each customer and the prices of the services to be performed for such customers, was secured by a promissory note in the amount of $85,000,

---

[1] Chetta is not a party to this appeal.

[2] The subject business, Down 2 Earth Lawn Care, LLC, also is a plaintiff in this action. In the interest of simplicity, in this opinion we treat Reyes as the sole plaintiff.

under which Chetta was required to make monthly payments to Amoroso until the entire debt was paid in full. The note provided that Chetta would be in default if he did not pay the full amount of each monthly payment within thirty days from the date on which it was due, and in the event of default by Chetta, Amoroso could accelerate the payment of the entire unpaid balance of the note. The agreement did not provide, however, that the business would revert to Amoroso in the event of a default. The note also provided as follows: "[T]his note shall bind the heirs, executors, administrators, successors and assigns of the Maker, and shall inure to the benefit of the Note Holders, their successors and assigns." Chetta made his last monthly payment on the note on March 9, 2008.

On January 23, 2008, Reyes purchased from Chetta all of the accounts of the business, which Chetta had previously purchased from Amoroso, for a total price of $50,000. Reyes paid the entire purchase price to Chetta without signing a note or assuming any obligation under Chetta's prior note to Amoroso.

Sometime during April, 2008, Amoroso saw Reyes performing landscaping services for one of his former customers. Reyes informed Amoroso that he had purchased Chetta's business for $50,000. Thereafter, on or about May 1, 2008, Amoroso contacted all of his former customers in an effort to get them to rehire him. When making such contacts, Amoroso informed his former customers that he was back in business and wanted their business back, but that they would first have to contact Reyes and cancel their services with him. According to Amoroso, he was able to persuade approximately 70 percent of his former customers to rehire him.

Reyes filed this action against Amoroso and Chetta, claiming breach of contract, tortious interference with

a business relationship or expectancy and conversion as to Chetta; tortious interference with a business relationship or expectancy as to Amoroso; and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and civil conspiracy as to both Chetta and Amoroso. Amoroso thereafter filed a cross complaint against Chetta for the unpaid balance due on the $85,000 promissory note.

Following trial and the filing of the parties' posttrial briefs, the court rendered a judgment of nonsuit as to the civil conspiracy counts against both Chetta and Amoroso, and as to the breach of contract, conversion and tortious interference with business relations counts against Chetta. The court also rendered a judgment of nonsuit against Amoroso on his cross complaint.[3] On June 4, 2012, the court filed a corrected memorandum of decision rendering judgment in favor of Reyes. The court found that Amoroso admitted that he knew that Reyes had paid Chetta $50,000 for the business; that Chetta was not yet technically in default of their contract; that, in the event of a default, the only remedy that their contract provided for was an acceleration of the due date of the balance to be paid in full; and that there was no provision in the contract that provided for the reversion of the business back to him. The court found that Amoroso had decided that he wanted "all of it back" and admitted that he " 'took it from [Reyes].' " Amoroso "contacted every customer on the list and told them that he was back in business, that he wanted their business back and asked them to cancel their service with [Reyes]." The court further found that Amoroso was aware that Reyes was just beginning to service the business accounts and that he would not

---

[3] Although it is not clear from the record what became of Reyes' CUTPA claim against Chetta, that has no bearing on the issues before us because the court rendered a judgment as to all of the causes of action against Amoroso. See Practice Book § 61-3.

have been able to establish an agreement with all of the customers, so it was an opportunity for him " 'to get his business back.' " The court determined that, in appropriating 70 percent of Reyes' potential clients, Amoroso "in effect eliminated [Reyes'] purchased business aspirations." On those bases, the court concluded that Reyes met his burden of proving his tortious interference claim against Amoroso, and thus awarded him damages in the amount of $50,000, plus prejudgment interest in the amount of $20,383.57.[4] The court also found that Amoroso had violated CUTPA with respect to Reyes, but declined to award Reyes damages for that violation because it had awarded him damages for the same losses on his tortious interference claim.[5] This appeal followed.

"A successful action for tortious interference with business expectancies requires the satisfaction of three elements: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." (Internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 90, 920 A.2d 357, cert. denied, 284 Conn. 901, 931 A.2d 261 (2007).

On appeal, Amoroso challenges the court's determination that he tortiously interfered with Reyes' business relations, its award of damages and its award of prejudgment interest. We address each claim in turn.

---

[4] Reyes also sought lost profits in the amount of $32,000, but the court rejected that claim as speculative. That determination has not been challenged on appeal.

[5] The court did, however, award attorney's fees under Reyes' CUTPA claim, and Amoroso has challenged that award on appeal. Because the court has not yet determined the amount of that award, this court dismissed that portion of Amoroso's appeal for lack of a final judgment. See *Stuart* v. *Stuart*, 112 Conn App. 160, 188–89, 962 A.2d 842 (2009), rev'd in part on other grounds, 297 Conn. 26, 996 A.2d 259 (2010).

## I

Amoroso first claims that the trial court improperly concluded that his conduct was tortious. "Our case law has recognized that not every act that disturbs a business expectancy is actionable. [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. . . . Accordingly, the plaintiff must plead and prove at least some improper motive or improper means. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that . . . the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . In the context of a tortious interference claim, the term malice is meant not in the sense of ill will, but intentional interference without justification. . . . In other words, the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]." (Citations omitted; internal quotation marks omitted.) Id., 90–91.

Our analysis of Reyes' tortious interference claim is further instructed by 4 Restatement (Second), Torts § 767 (1979), which sets forth seven factors to consider in determining whether the interference is improper, namely: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." See also *Golembeski* v. *Metichewan Grange No. 190*, 20 Conn. App. 699, 702 n.3, 569 A.2d 1157, cert. denied, 214 Conn. 809, 573 A.2d 320 (1990).

In examining the propriety of the court's judgment, we must determine "whether the court's conclusions

were legally and logically correct and whether they are supported by the facts appearing in the record. . . . [W]e must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the [party or] parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge [and/or] the jury, who saw the witnesses and heard the testimony . . . . The . . . judgment [will be reversed] only if we find that the [court] could not reasonably and legally have reached [its] conclusion. . . . We apply this familiar and deferential scope of review, however, in light of the equally familiar principle that the [plaintiff] must produce sufficient evidence to remove the [court's] function of examining inferences and finding facts from the realm of speculation." (Internal quotation marks omitted.) *American Diamond Exchange, Inc.* v. *Alpert*, supra, 101 Conn. App. 89.

Most of Amoroso's argument relies upon his contention that the court improperly found that Amoroso told his former customers that he called them to cancel their services with Reyes. That argument, however, is belied by Amoroso's own testimony, which he quotes in his brief to this court. There, he explicitly stated that "I had them call Reyes and cancel the service and then call me back . . . ."[6]

---

[6] At trial, Amoroso testified: "[O]nce I [came] to terms that I was definitely out of everything, then I started to make phone calls to the customers on—on the list. . . . I told [them]—well, basically the conversation went they—most of them knew who I was just by my voice, but I said that you know that I sold the business to [Chetta], now [Chetta] in turn sold the business to somebody else, and [Chetta] stopped paying me. So I said, just to let you know, I have to go back in business. And, you know, a lot of them said, okay, well, put me back on the list, and I, you know, said, I can't do that. You know, you have to call Reyes because they were—you know, I didn't want to show up with both of us on the lawn at the same time. So I—I had the customers call—after they hung up with me, I had them . . . call Reyes and cancel the service and then call me back so I can make a separate list."

Amoroso acknowledges that his conduct was intentional, that he called his former customers on the list and he solicited their business, all the while knowing that those accounts had been sold to Reyes, but argued at trial, and continues to argue now, that he was justified in doing so because he was not receiving payments from Chetta. In short, he relies upon the fact that Chetta was not fulfilling his obligations under their agreement as justification for him to go after the accounts that Chetta thereafter had sold to Reyes. Chetta's default on his obligations to Amoroso, however, does not support Amoroso's claim that he did not tortiously interfere with Reyes' business relations; in fact, if Chetta was in default, Amoroso's agreement with Chetta specifically provided for Amoroso's remedies, none of which included taking back his customers, and in essence, his business. Amoroso's argument in this regard also underscores the puzzling fact that he has not pursued any remedy or taken any legal action against Chetta. In that regard, the court further noted: "In addition to successfully appropriating the potential clients of [Reyes], Amoroso had initially filed a cross complaint against Chetta seeking the balance of the sales price for the business he sold to Chetta; summarily attempting to collect the balance of the $85,000 sales price of the business and enjoy a double recovery by simultaneously keeping the business for himself." The record supports the court's factual findings.[7] We thus conclude that there is ample evidence in the record from which the court reasonably could have concluded that Amoroso's conduct was tortious.[8]

[7] As noted herein, the promissory note securing the agreement between Amoroso and Chetta inured to the benefit of each party's successors and assigns. The agreement thus contemplated that Chetta might transfer the business to a third party, who would acquire all of its customers and good will free from any interference by Amoroso, who retained no right to take the business back if Chetta ceased to operate it himself.

[8] Because we affirm the judgment of the court as to the tortious interference claim, we need not consider Amoroso's claims on appeal regarding CUTPA.

## II

Amoroso next challenges the court's award of damages. As previously noted, "it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 33, 761 A.2d 1268 (2000).

"It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 689, 697 A.2d 1137 (1997). "In determining the proper measure of damages, we are guided by the purpose of compensatory damages, which is to restore an injured party to the position he or she would have been in if the wrong had not been committed." (Internal quotation marks omitted.) *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 248, 905 A.2d 1165 (2006).

Section 774A (1) of 4 Restatement (Second) of Torts provides: "One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."

We accord plenary review to the court's legal basis for its damages award. See *First Federal Savings & Loan Assn. of Rochester* v. *Charter Appraisal Co.*, 247

Conn. 597, 603, 724 A.2d 497 (1999). The court's calcula-
tion under that legal basis is a question of fact, which
we review under the clearly erroneous standard. See
*Westport Taxi Service, Inc.* v. *Westport Transit Dis-
trict*, 235 Conn. 1, 28, 664 A.2d 719 (1995).

"The amount of a damage award is a matter peculiarly
within the province of the trier of fact . . . ." (Internal
quotation marks omitted.) *Cheryl Terry Enterprises,
Ltd.* v. *Hartford*, 270 Conn. 619, 639, 854 A.2d 1066
(2004). "[W]e cannot disturb the court's finding as to
the amount of damages unless it appears that the court
unreasonably exercised the large discretion necessarily
vested in it and awarded damages so excessive as to be
unreasonable and to amount to an injustice." (Internal
quotation marks omitted.) *Hart, Nininger & Campbell
Associates, Inc.* v. *Rogers*, 16 Conn. App. 619, 635, 548
A.2d 758 (1988).

Amoroso claims that there is no causal connection
between his allegedly tortious conduct and Reyes' loss
that would give rise to an award of $50,000. The court,
however, specifically found that Amoroso's conduct
deprived Reyes of ever receiving any benefit from his
purchase of the business, for which he paid $50,000. In
essence, the court found Reyes' actual loss to be the
$50,000 that he paid for the accounts, which Amoroso
took from him. Amoroso has not provided any law, nor
are we aware of any, that would preclude the court
from awarding damages based upon the loss of the
price that Reyes had paid for the business that he lost
as a result of Amoroso's tortious conduct.[9]

Amoroso further contends that, "[i]f anything, the
loss claimed to have been caused by [him] (which of

[9] In light of the fact that Amoroso had sold the business to Chetta for
$85,000 less than one year prior to taking it back from Reyes, Amoroso does
not, and reasonably cannot, argue that the $50,000 exceeds the value of
the business.

course is disputed) would be the net profit on the [70 percent] of the customers who returned to [him]." This measure of damages, however, was specifically rejected by this court in *American Diamond Exchange* v. *Alpert*, supra, 101 Conn. App. 103 (proper measure of damages in action for tortious interference with business expectancy is not profit to defendant).

Amoroso argues that even if we conclude that the $50,000 that Reyes paid for the business was an appropriate measure of damages, the award should be only 70 percent of that $50,000 purchase price because he testified that he was only able to solicit 70 percent of his customers back. The trial court determined, however, that Amoroso, by his conduct, took the entire business away from Reyes, and thus that Reyes was not able to obtain any benefit from that business, for which he had paid Chetta the price of $50,000. The court found that, in appropriating 70 percent of Reyes' potential clients, Amoroso, "in effect, eliminated [Reyes'] purchased business aspirations." It is not unreasonable to conclude that because Reyes was left with only 30 percent of the accounts that he had purchased, those accounts were insufficient to maintain the business, and thus Amoroso's conduct had resulted in the total loss of the business to Reyes. We thus conclude that the court did not abuse its discretion in awarding damages in the amount of $50,000 to Reyes.

III

Finally, Amoroso challenges the court's award of prejudgment interest in the amount of $20,383.57. The court did not set forth the legal or factual bases for its interest award, and simply stated that it covered the period "from May 1, 2008, to the date of this judgment." Although Amoroso speculates, in his brief to this court, that the prejudgment interest award "presumably" was based upon General Statutes § 37-1, the prayer for relief

in Reyes' complaint seeks prejudgment interest pursuant to General Statutes § 37-3a. Accordingly, § 37-3a is the only statute upon which the court could have based its award of prejudgment interest and we thus review the court's award in light of that statute.

"Section 37-3a provides a substantive right that applies only to certain claims. . . . It does not allow prejudgment interest on claims that are not yet payable, such as awards for punitive damages . . . or on claims that do not involve the wrongful detention of money, such as personal injury claims . . . . Under § 37-3a, an allowance of prejudgment interest turns on whether the detention of the money is or is not wrongful under the circumstances. . . . There are well established propositions that § 37-3a provides for interest on money detained after it becomes due and payable, that the question under that statute is whether the money was wrongfully withheld . . . . The statute, therefore, applies to claims involving the wrongful detention of money *after* it becomes due and payable." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 739–40, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996). "To award § 37-3a interest, two components must be present. First, the claim to which the prejudgment interest attaches must be a claim for a liquidated sum of money wrongfully withheld and, second, the trier of fact must find, in its discretion, that equitable considerations warrant the payment of interest." *Ceci Bros., Inc.* v. *Five Twenty-one Corp.*, 81 Conn. App. 419, 428, 840 A.2d 578, cert. denied, 268 Conn. 922, 846 A.2d 881 (2004).

Here, Reyes did not assert a claim for a liquidated sum of money that Amoroso wrongfully withheld from him. The court's award of prejudgment interest therefore was improper.

The judgment is reversed only as to the award of prejudgment interest and the case is remanded with direction to vacate that award. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.