******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CROSSKEY ARCHITECTS, LLC *v.* POKO PARTNERS, LLC, ET AL.
## (AC 40693)

DiPentima, C. J., and Keller and Olear, Js.

*Syllabus*

The plaintiff, an architectural firm owned by a licensed architect, C, sought to recover damages from the defendants for the unpaid work it had performed on four projects. The plaintiff alleged claims for breach of contract, quantum meruit and unjust enrichment regarding each of the four projects, and sought to pierce the corporate veil. C had a business relationship with K and the defendant R, who together oversaw the defendant business entities and owned the majority interest in nearly all of them. K and R managed their business entities by having the businesses owned by one limited liability company while being managed and controlled by another, and at the top of that corporate structure were the defendants P Co. and M Co. The trial court noted that K rationalized his refusal to pay the plaintiff for architectural services rendered for two of the projects, including a certain reservoir project, by claiming that the plaintiff was working "on spec" or without compensation for its services unless and until the projects were ultimately approved for funding. The court found, however, that there was no credible evidence that the plaintiff or C agreed to that arrangement. The court rendered judgment in part in favor of the plaintiff and found in favor of the plaintiff on three of its claims for breach of contract, as well as on its claim for quantum meruit as to the reservoir project. The trial court also pierced the corporate veil, holding K and R personally liable for damages awarded on each count found in favor of the plaintiff, and awarded prejudgment interest pursuant to statute (§ 37-3a) on all the damages. On the defendants' appeal to this court, *held*:

1. The defendants could not prevail on their claim that the trial court improperly pierced the corporate veil and held K and R personally liable under the identity rule, which was based on their claim that the court improperly found that the identity test was satisfied based solely on its finding that K and R controlled the defendant business entities and failed to examine issues of unity of interest and corporate independence: the defendants mischaracterized the trial court's decision and failed to show that the court misapplied the identity theory, as the court properly examined control in addition to other factors, cited the correct law regarding the identity theory, found facts in support of the identity theory, and concluded that the plaintiff had proven it was entitled to compensation under the identity rule; moreover, the defendants' claim that the plaintiff presented no evidence to support the identity rule was unavailing, as the court's factual findings, including that P Co. and M Co. were the locus of power for the overall organization through which K and R maintained virtually unchecked power and control, supported the notion that the real actors were K and R, who controlled the defendant business entities as one enterprise while improperly using the corporate form to their benefit and to the detriment of legitimate creditors; furthermore, the defendants could not prevail on their claim that the trial court failed to properly consider whether the defendant business entities served a legitimate business purpose, as the circumstances necessary for piercing the corporate veil vary according to each case and the lack of a legitimate business purpose is not a necessary component of the identity test but, rather, is an example of the exceptional circumstances under which the veil could be pierced.

2. The defendants could not prevail on their claim that the trial court improperly found that the plaintiff was entitled to damages on the theory of quantum meruit as to the reservoir project, which was based on their claim that the plaintiff's schematic plans only made possible an opportunity to incur a benefit in the future, and that because the reservoir project did not go forward, the defendants did not incur that future benefit and, instead, lost money; the trial court found credible the evidence that the plaintiff was not working "on spec," and this court would

not second-guess this determination, and even though the defendants did not receive an economic gain from the outcome of the reservoir project itself, under the equitable doctrine of quantum meruit, a defendant that obtains the services requested receives a benefit, and there was sufficient evidence for the trial court properly to determine that the defendants derived a benefit from the services provided by the plaintiff, as the court found an implied in fact contract and determined that the plaintiff performed architectural services as requested under the first phase of the unsigned contract.

3. The defendants could not prevail on their claim that the trial court improperly calculated the amount of damages because no factual support existed in the record for the value of the benefit, which was based on their claim that K stated in his deposition testimony that the plaintiff's services were provided "on spec," that the defendants did not express any willingness to pay the plaintiff the price on its reservoir project invoice, and that the court found that no contract existed; the trial court did not find credible K's testimony that the plaintiff was providing services "on spec" but, instead, found that K accepted the terms of the contract by his conduct, that K was fully aware that he had an obligation to pay for services, and that the parties had an implied in fact contract, and the court's factual findings were supported by evidence from the record, including the unsigned written contract, invoices, and the testimony of witnesses for the plaintiff and the defendants, and provided a sufficient basis for the court to determine that the contract price, as expressed in the unenforceable contract, for the services rendered constitutes the measure of the value of the benefit to the defendants.

4. The defendants' claim that the trial court lacked the discretion to award statutory prejudgment interest pursuant to § 37-3a on the plaintiff's claim for quantum meruit as to the reservoir project was unavailing, as an award for damages under the doctrine of quantum meruit falls within the scope of § 37-3a: this court previously has declined to create a rule disallowing interest under § 37-3a in an action seeking damages for unjust enrichment, and the defendants have not provided a compelling argument for disallowing statutory prejudgment interest in an action seeking damages in quantum meruit, as there is no reasonable distinction between claims sounding in unjust enrichment and those sounding in quantum meruit for purposes of § 37-3a; moreover, the trial court did not abuse its discretion in awarding prejudgment interest under the facts of the present case, as the court's findings as to the reservoir project supported a conclusion that the money was due and payable pursuant to the unsigned contract, the amount claimed to be due could be fixed by a mathematical calculation from ascertainable data, and the defendants did not challenge the court's implicit finding that the money was wrongfully detained.

Argued April 15—officially released September 10, 2019

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the action was withdrawn as to the defendant One Morningside Drive Partners, Limited Partnership; thereafter, the court, *Robaina, J.*, granted the plaintiff's amended motion to cite in POKO Management Corp. as a party defendant; subsequently, the matter was tried to the court, *Elgo, J.*; judgment in part for the plaintiff, from which the defendants appealed to this court; thereafter, the court, *Elgo, J.*, issued a rectification of its decision; subsequently, Pamela Olson, as executrix of the estate of Kenneth M. Olson, was substituted as a defendant. *Affirmed.*

*Thomas E. Katon*, with whom, on the brief, was *Adam D. Miller*, for the appellants (defendants).

*Kirk D. Tavtigian, Jr.*, with whom was *George M.*

*Purtill*, for the appellee (plaintiff).

*Opinion*

DiPENTIMA, C. J. The defendants[1] POKO Partners, LLC, POKO Reservoir Yaremich Developers, LLC, POKO Cape Loom Managers, LLC, One Morningside Group, LLC, One Morningside Managers, LLC, One Morningside Owners, LLC, Capehart Ventures, LLC, POKO Management Corp., Richard K. Olson, and Pamela Olson, as executrix of the estate of Kenneth M. Olson,[2] appeal from the judgment of the trial court rendered in part in favor of the plaintiff, Crosskey Architects, LLC. On appeal, the defendants claim that the court (1) improperly pierced the corporate veil, (2) improperly found that the plaintiff was entitled to damages on the theory of quantum meruit and (3) abused its discretion in awarding statutory prejudgment interest pursuant to General Statutes § 37-3a[3] on the theory of quantum meruit. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant. The plaintiff is an architectural firm owned by William Crosskey, a licensed architect. From 2006 to 2015, Crosskey had a business relationship with Kenneth Olson and his brother, Richard Olson. The Olsons oversaw between forty to sixty business entities established for the purpose of commercial and residential real estate development. The Olsons managed their business entities by having the businesses owned by one limited liability company while being managed and controlled by another. At the top of this structure are POKO Partners, LLC, in which Kenneth Olson has a 50 percent ownership interest, Richard Olson has a 40 percent ownership interest and Pamela Olson, Kenneth Olson's wife, has a 10 percent interest; and POKO Management Corp., in which Kenneth Olson has a 60 percent ownership interest and Richard Olson has a 40 percent ownership interest. Either Kenneth Olson or the Olsons together own a majority interest in nearly all of the defendant entities. The defendant entities owned by the Olsons operate out of one office in Port Chester, New York. All of the personnel working out of this office are paid by either POKO Partners, LLC, or POKO Management Corp. The Olsons' salaries are paid exclusively from POKO Management Corp.

In the thirteen count operative complaint, the plaintiff sought damages for the unpaid work it had performed on four projects of the Olsons: the POKO office project, the Reservoir project, the Morningside Drive project and the Capehart project. The plaintiff alleged breach of contract, quantum meruit and unjust enrichment regarding each of the four projects, and sought to pierce the corporate veil.

The court described the plaintiff's work on the four projects as follows. Kenneth Olson began communica-

tions with Crosskey in 2008, regarding the POKO office project, which involved renovating the office in Port Chester. Employees of the plaintiff exchanged e-mails with Richard Olson and an employee of POKO Partners, LLC, regarding the work requested. The work requested was done and accepted at the hourly rates that the plaintiff had charged since the beginning of the plaintiff's business relationship with the Olsons. After completing the work, Crosskey sent Kenneth Olson and POKO Partners, LLC, invoices totaling $4690.24 as of October 15, 2008, but the plaintiff was not paid. Richard Olson explained that the plaintiff was not paid because he and his brother assumed that the plaintiff would write off the costs.

The Reservoir project involved new construction, mixed-use housing and commercial space development in the city of Bridgeport. In September, 2006, Kenneth Olson solicited the plaintiff's architectural services. Although the project never went forward, the plaintiff performed work on the project and submitted invoices. The plaintiff was never paid.

The Morningside Drive project involved a group of small office buildings owned by Kenneth Olson on One Morningside Drive in Westport. The plaintiff provided architectural services in connection with this project. POKO Management Corp. was the property manager for One Morningside Drive, which was being developed in order to sell to Newman's Own Real Estate, LLC. Following the sale, POKO Management Corp. continued to use the plaintiff's services for ongoing projects at One Morningside Drive. There was an ongoing agreement in which the plaintiff was solicited to provide architectural services and the defendants would pay the plaintiff's hourly rates. Crosskey sent unpaid invoices in the amount of $10,480.10 to POKO Partners, LLC, and POKO Management Corp. One Morningside Managers, LLC, was the managing entity of One Morningside Group, LLC, in which Richard Olson and Kenneth Olson each had a 37.5 percent interest, respectively, and the remaining 25 percent was owned by employees of the defendant entities. One Morningside Managers, LLC, was dissolved in 2014, after the buildings were sold to Newman's Own Real Estate, LLC, for $5.8 million. At that time, One Morningside Group, LLC, of which Kenneth Olson was an investor, netted $1,669,702.51. In reliance on an agreement that he would be paid, Crosskey continued to accept work from Kenneth Olson, but he was not paid.

The Capehart project concerned the development of an old mill building in Norwich into apartment buildings. Kenneth Olson signed a contract in which he was identified as the managing member under the auspices of Capehart Ventures, LLC.[4] The Capehart project never came to fruition, and the court noted that Kenneth Olson's deposition testimony revealed that "close to a

million and a half dollars" was lost on the project. (Internal quotation marks omitted.) POKO Partners, LLC, the project manager on this project, received $450,000 in project management fees. The plaintiff's outstanding bill for the project totaled $31,383.93, with late charges totaling $63,775.71. The court noted that Kenneth Olson "rationalized his refusal to pay the plaintiff for architectural services rendered for the Reservoir and Capehart projects by claiming that the plaintiff was 'on spec.' In other words, the plaintiff was effectively working without compensation for [its] services unless and until the projects were ultimately approved for funding. There is, however, no credible evidence that the plaintiff or Crosskey agreed to this arrangement."

The court found in favor of the plaintiff on the first count of the complaint alleging breach of contract as to the POKO office project as against POKO Partners, LLC, and POKO Management Corp. in the amount of $4690.24 plus interest; on the fifth count of the complaint addressing the Reservoir project and seeking quantum meruit as to POKO Partners, LLC, POKO Management Corp. and POKO Reservoir Yaremich Developers, LLC, in the amount of $23,907.70 plus interest; on the seventh count of the complaint, alleging breach of contract as to the Morningside Drive project as against POKO Partners, LLC, POKO Management Corp., One Morningside Group, LLC, and One Morningside Managers, LLC, in the amount of $10,480.09 plus interest; and on the tenth count of the complaint alleging breach of contract as to the Capehart project as against POKO Partners, LLC, Capehart Ventures, LLC, and POKO Cape Loom Managers, LLC,[5] in the amount of $31,383.93 plus interest. The court also found that the plaintiff prevailed on the thirteenth count of the complaint and pierced the corporate veil, holding the Olsons personally liable for damages awarded on each count found in favor of the plaintiff. The court dismissed all other counts of the complaint as moot. The court awarded prejudgment interest pursuant to § 37-3a on all the damages. This appeal followed. Additional facts will be set forth as necessary.

I

The defendants claim that the court improperly pierced the corporate veil and held the Olsons personally liable under the identity rule.[6] They argue that the court (1) misapplied the identity rule and (2) failed to properly consider whether the defendant entities served a legitimate business purpose. We are not persuaded.

We note the following relevant law. "Whether the circumstances of a particular case justify the piercing of the corporate veil presents a question of fact. . . . Accordingly, we defer to the trial court's decision to pierce the corporate veil, as well as any subsidiary factual findings, unless they are clearly erroneous. . . . A court's determination is clearly erroneous only in cases

in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"Generally, a corporation is a distinct legal entity and the stockholders are not personally liable for the acts and obligations of the corporation . . . . Courts will, however, disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor." (Citations omitted; internal quotation marks omitted.) *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, 304 Conn. 128, 138–39, 37 A.3d 724 (2012).

We address the defendants' arguments in turn.

A

The defendants argue that the court misapplied the identity rule. They contend that the court improperly found that the identity test was satisfied based solely on its finding that the Olsons controlled the defendant entities. They argue that control is not relevant to the identity test and concerns, instead, the first prong of the instrumentality test. We are not persuaded.

"It is well established that [t]he . . . determination of the proper legal standard in any given case is a question of law subject to our plenary review." (Internal quotation marks omitted.) *Mirjavadi* v. *Vakilzadeh*, 310 Conn. 176, 183, 74 A.3d 1278 (2013).

"When determining whether piercing the corporate veil is proper, our Supreme Court has endorsed two tests: the instrumentality test and the identity test."[7] (Internal quotation marks omitted.) *KLM Industries, Inc.* v. *Tylutki*, 75 Conn. App. 27, 32, 815 A.2d 688, cert. denied, 263 Conn. 916, 821 A.2d 770 (2003). The instrumentality rule has three prongs, the first of which requires "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own . . . ."[8] (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 232, 990 A.2d 326 (2010). To pierce the corporate veil under the identity rule, the plaintiff must show that "there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Internal quotation marks omitted.)

Id. "[T]he identity rule is applicable against individuals, as well as corporations . . . ." (Citation omitted.) Id., 237.

The defendants argue that the court based its determination that the identity rule was satisfied solely on its finding that the Olsons controlled the defendant entities and failed to examine issues of unity of interest and corporate independence. The defendants mischaracterize the trial court's decision and have not shown that the court misapplied the identity theory. The trial court examined control in addition to other factors, and such an analysis does not evince a misapplication of the identity rule. The court cited the correct law regarding the identity theory, found facts in support of the theory and concluded that the plaintiff had proven it was entitled to compensation under the identity rule. "Generally, appellate courts presume that the trial court knows and has applied the law correctly in the absence of evidence to the contrary. . . . [I]t is the burden of the appellant to show to the contrary." (Citation omitted; internal quotation marks omitted.) *Havis-Carbone* v. *Carbone*, 155 Conn. App. 848, 867, 112 A.3d 779 (2015).

Nothing prevents a trial court from examining control along with other factors as a method by which to conclude that certain aspects of the identity rule have been met. "[T]he identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, *controlled* as one enterprise . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Falcone* v. *Night Watchman, Inc.*, 11 Conn. App. 218, 221, 526 A.2d 550 (1987). "No hard and fast rule . . . as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case. . . . It is clear that the key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 555–57, 447 A.2d 406 (1982). "In *Zaist* [v. *Olson*, 154 Conn. 563, 578, 227 A.2d 552 (1967)], [our Supreme Court] found the controlling stockholder and a related corporation liable under an alter ego theory, concluding that the corporate structure of the defendant in that case could properly have been disregarded under either the instrumentality rule or the identity rule." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 232.

Alternatively, the defendants argue essentially that the plaintiff presented no evidence to support the identity rule. They also contend that the court failed to make certain findings, but they did not request an articulation on those grounds.[9] Instead of focusing on findings that the court did not make, we note that "each case in

which the issue is raised should be regarded as sui generis, to be decided in accordance with its own underlying facts." (Internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 556 n.7. After a thorough examination, we conclude that the factual findings that the trial court made support a finding that the identity rule was satisfied. The court found that (1) POKO Partners, LLC, and POKO Management Corp. were the locus of power for the overall organization through which the Olsons maintained virtually unchecked power and control; (2) POKO Management Corp., "which receives 'reimbursements' through every company that does business with [the defendant entities] for expense[s], pays salaries to [the Olsons]"; (3) Kenneth Olson viewed the lack of clarity in the overall corporate structure of the defendant entities as a virtue;[10] (4) Kenneth Olson intentionally misled Crosskey on the projects that did not move forward into providing architectural services, and later recast the arrangement as being " 'on spec' "; (5) the defendant entities were located in one office, and shared all office supplies and equipment, including computers; (6) Kenneth Olson signed all of his e-mails as emanating from POKO Partners, LLC, regardless of whether another defendant entity was purporting to handle the matter; (7) the defendant entities were "stack[ed]" to provide the Olsons with layers of protection; and (8) the Olsons would pay themselves first without notice to legitimate creditors, would dissolve or abandon companies when it was not convenient for them to proceed with a project, would ask vendors to supply services to companies that had no reasonable capitalization and would hire vendors through one company while forming another single purpose entity in order to absorb liabilities.[11]

"The essential purposes of the corporate structure, including stockholder immunity, must and will be protected when the corporation functions as an entity in the normal manner contemplated and permitted by law. When it functions in this manner, there is nothing insidious in stockholder control, interlocking directorates or identity of officers. When, however, the corporation is so manipulated by an individual or another corporate entity as to become a mere puppet or tool for the manipulator, justice may require the courts to disregard the corporate fiction and impose liability on the real actor." *Zaist* v. *Olson*, supra, 154 Conn. 574–75. "When the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded." (Internal quotation marks omitted.) *Falcone* v. *Night Watchman, Inc.*, supra, 11 Conn. App. 220. The court's findings support the notion that the real actors were the Olsons, who controlled the defendant entities as one enterprise while improperly

using the corporate form to their benefit and to the detriment of legitimate creditors. We conclude that the court's finding that the particular circumstances of this case justify piercing the corporate veil under the identity theory was not clearly erroneous.

B

The defendants next argue that the court "failed to properly apply the second prong of the *Naples* [v. *Keystone Building & Development Corp.*, supra, 295 Conn. 214] analysis: that the corporate entity served no legitimate business purpose . . . ." We disagree.

The defendants' argument is unavailing because it is premised on a misstatement of the law. As aptly stated by Justice Borden in his dissent in *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 575, "[u]nlike the instrumentality theory, under which there are three specific elements of proof, the identity theory is undifferentiated." The seminal case of *Zaist* v. *Olson*, supra, 154 Conn. 576, and its progeny express the identity rule as follows: "If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Internal quotation marks omitted.)

In *Naples* v. *Keystone Building & Development Corp.*, supra, 295 Conn. 233–34, our Supreme Court, after setting forth the identity rule, stated: "The concept of piercing the corporate veil is equitable in nature. . . . No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case. . . . Ordinarily the corporate veil is pierced only under exceptional circumstances, *for example*, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice. . . . The improper use of the corporate form is the key to the inquiry, as [i]t is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations." (Citations omitted; emphasis added; internal quotation marks omitted.)

Our Supreme Court in *Naples* stated that the circumstances necessary for piercing the corporate veil vary according to each case. Id., 233. The court cited, as an example of the exceptional circumstances under which

the veil could be pierced, the situation where a corporation served no legitimate purpose. Id. The court did not state that the lack of a legitimate purpose was an element necessary to pierce the corporate veil under the identity theory. See id. Our Supreme Court in *Naples* noted that for reasons of public policy an improper use of the corporate form was key to the inquiry. Id., 233–34. Because the lack of a legitimate business purpose is not a necessary component of the identity test, the defendants' argument is without merit.

## II

The defendants claim that the court improperly found that the plaintiff was entitled to damages on the theory of quantum meruit as to the Reservoir project.[12] We disagree.

The court found the following additional relevant facts regarding the Reservoir project. Kenneth Olson solicited the plaintiff to provide architectural services for this project. The plaintiff provided an initial sketch, which Kenneth Olson submitted in response to Bridgeport's request for proposal, and POKO Partners, LLC, was selected. The plaintiff sent Kenneth Olson and POKO Partners, LLC, a contract that outlined the plaintiff's services and included a breakdown of fees according to the five phases of the project. Kenneth Olson reviewed the contract, did not sign it, but by his conduct accepted its terms. The Reservoir project, however, never went forward.

The court did not find that an enforceable contract existed with respect to the Reservoir project because Kenneth Olson failed to sign the contract. The court found that the defendants used the plaintiff's architectural services "in an attempt to secure the development rights for the project. This unequivocally evidences that the defendants received a benefit from the architectural services rendered because without the plaintiff's services, the opportunity to secure the rights to develop the project would not have come to fruition. This court can also find that the defendants' prior dealings with the plaintiff substantiates their knowledge that the plaintiff does not work for free or 'on spec' and [that] withholding payment based on such an unfounded basis is unjust." The court found that the plaintiff had proven its claim of quantum meruit and awarded $23,907.70 in damages plus interest.

## A

The defendants argue that the court improperly determined that they received a benefit from the plaintiff's architectural services on the Reservoir project. They contend that the plaintiff's schematic plans only made possible an opportunity to incur a benefit in the future, but because the Reservoir project did not go forward, the defendants did not incur that future benefit and, instead, lost money. The defendants further argue that

they did not unjustly fail to pay because both parties were working " 'on spec' " and, therefore, neither party was compensated when the project did not go forward. We are not persuaded.

"Determining whether the equitable [doctrine] of quantum meruit . . . [is] applicable in any case requires a factual examination of the particular circumstances and conduct of the parties. . . . The factual findings of a trial court must stand, therefore, unless they are clearly erroneous or involve an abuse of discretion. . . . When a trial court's legal conclusions are challenged, however, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Citations omitted; internal quotation marks omitted.) *David M. Somers & Associates*, *P.C.* v. *Busch*, 283 Conn. 396, 407, 927 A.2d 832 (2007).

"Quantum meruit is a theory of contract recovery that does not depend upon the existence of a contract, either express or implied in fact. . . . Rather, quantum meruit arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement. . . . Quantum meruit literally means as much as he has deserved . . . . Centered on the prevention of injustice, quantum meruit strikes the appropriate balance by evaluating the equities and guaranteeing that the party who has rendered services receives a reasonable sum for those services." (Citations omitted; internal quotation marks omitted.) *Gagne* v. *Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416 (2001).

We are not persuaded by the defendants' argument that they did not unjustly fail to pay. The defendants highlight the deposition testimony of Kenneth Olson in which he stated that it was his understanding that services for the Reservoir project were provided " 'on spec.' " The court had before it the unsigned contract that included a fee proposal. Crosskey testified that he did not agree to work for free and that there was nothing in the unsigned contract concerning free work. The court found credible the evidence that the plaintiff was not working " 'on spec,' " and we will not second-guess this determination. "Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings." (Internal quotation marks omitted.) *Ackerman* v. *Sobol Family Partnership*, *LLP*, 298 Conn. 495, 508, 4 A.3d 288 (2010).

Our review of the record persuades us that there was sufficient evidence for the court properly to determine that the defendants derived a benefit from the plaintiff's services. Crosskey testified that Bridgeport put out a request for proposal to development teams and that Kenneth Olson solicited his services to draw a sketch to submit in response. He testified that "once [Kenneth Olson] was awarded the project as the selected developer he then asked me to put together a fee proposal

to do the architectural and engineering services for the remainder of the project." Crosskey explained that after Kenneth Olson had received the contract, which included a fee proposal, he instructed Crosskey to continue to work. Crosskey also testified that he made plans for the project that included, among other things, schematic plans, a site plan, floor plans of the individual apartments, color renderings for the building exterior and a zoning regulation review. Crosskey further testified that Kenneth Olson used the plans.

Although the defendants did not receive an economic gain from the outcome of Reservoir project itself, it was not improper for the court to determine that the defendants, nonetheless, received a benefit from the services that the plaintiff provided with respect to the Reservoir project. The court found an implied in fact contract and determined that the plaintiff performed architectural services as requested under the first phase of the unsigned contract.

Under the equitable doctrine of quantum meruit, a defendant that obtains the services requested receives a benefit. "Quantum meruit is usually a remedy based on implied contract and usually relates to the benefit of work, labor or services received by the party who was unjustly enriched . . . ." (Citation omitted.) *United Coastal Industries, Inc.* v. *Clearheart Construction Co.*, 71 Conn. App. 506, 512, 802 A.2d 901 (2002). "The defendant is benefitted when he gets what he wants, regardless of market value." 1 D. Dobbs, Law of Remedies (2d Ed. 1993) § 4.5 (2), p. 634. "Requested services are treated as benefits to the person who made the request." Id., § 4.5 (4), p. 651. "[E]quitable remedies are not bound by formula but are molded to the needs of justice." (Internal quotation marks omitted.) *Stewart* v. *King*, 121 Conn. App. 64, 71, 994 A.2d 308 (2010). We conclude that it was within the province of the court, in examining the circumstances and the conduct of the parties and in balancing the equities, to determine that the plaintiff was entitled to recovery under the doctrine of quantum meruit.

B

The defendants next argue that the court improperly calculated the amount of damages because no factual support existed in the record for the value of the benefit. In support of this argument, the defendants contend that Kenneth Olson stated in his deposition testimony that the plaintiff's services were provided " 'on spec,' " that the defendants did not express any willingness to pay the plaintiff the price on its Reservoir project invoice and that the court found that no contract existed. We are not persuaded.

"The amount of damages available under [quantum meruit], if any, is . . . a question for the trier of fact. . . . The factual findings of a trial court must stand,

therefore, unless they are clearly erroneous or involve an abuse of discretion. . . . The measure of damages in restitution is the reasonable value of the benefit to the defendant. . . . [W]herever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract, restitution of the value of what has been given must be allowed. . . .

"The measure of restitution is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . .

"A court may select from among several methods of determining the amount of recovery in restitution, depending on the circumstances and conduct of the parties in a particular case. . . . Although not directly enforceable under the contract, the contract price is evidence of the reasonable value of the benefit the defendant received from the plaintiff." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Walpole Woodworkers, Inc.* v. *Manning*, 307 Conn. 582, 588–90, 57 A.3d 730 (2012).

We note that the court did not find credible Kenneth Olson's testimony that the plaintiff was providing services " 'on spec.' " The court found that Kenneth Olson accepted the terms of the contract by his conduct, and that he was fully aware that he had an obligation to pay for services. The court further found that Kenneth Olson's failure to sign the contract made it ambiguous as to who or which entity was liable under the contract and made "it difficult for [the] court to find that there was a meeting of the minds with respect to the contracting party relative to [the Reservoir project]." The court additionally found that "[u]nder the various applications of quantum meruit under the Restatement [(Third) of Restitution and Unjust Enrichment], and given the equitable character of the doctrine, [the] court finds that the ambiguity as to which entity entered into a contract is not fatal to the plaintiff's ability to demonstrate that it is entitled to the value of services conferred upon the defendants pursuant to the contract, albeit unsigned." The court determined that the parties had an implied in fact contract and awarded damages in the amount of $23,907.70, plus interest, for services rendered under the doctrine of quantum meruit.

The court's factual findings are supported by evidence from the record and provide a sufficient basis for the court to determine that the contract price, as expressed in the unenforceable contract, for the ser-

vices rendered constitutes the measure of the value of the benefit to the defendants. The court had for its review the unsigned written contract, the invoices, as well as the testimony of witnesses for the plaintiff and the defendants. Crosskey testified that he sent a written contract to Kenneth Olson regarding the Reservoir project and that, after Bridgeport selected their proposal, Kenneth Olson asked Crosskey to make a fee proposal for the architectural and engineering services for the remainder of the project. The contract included a breakdown of the plaintiff's fees according to the five phases of the project. The court found that because the project did not go forward, the plaintiff provided only one-half of the schematic design services that were contemplated under the first phase of the project. The contract showed a total fee of $45,500 for the schematic design under the first phase of the project. The invoice the plaintiff sent to Kenneth Olson reflected that 50 percent of the schematic design services were provided under the first phase of the project, at a cost of $22,750, and that the professional design services provided by Crosskey, plus postal charges and in-house printing, totaled $1157.70, for a total principal amount of $23,907.70.

The defendants also argue that "[d]ue to the uncertain value of a mere opportunity to compete for a municipal contract, the plaintiff was required to set forth further evidence that its invoice on the Reservoir project reflected a reasonable value of the benefit to the defendants." As we have stated in part II A of this opinion, the court's finding of a benefit was supported by the record. It was within the province of the court to determine, in balancing the equities, that the proper valuation of the benefit conferred on the defendants was the monetary value of the services performed by the plaintiff as reflected in the unsigned written contract. We conclude that the court's award of damages was not clearly erroneous.

### III

The defendants' last claim is that the court improperly awarded statutory prejudgment interest pursuant to § 37-3a on the plaintiff's claim for quantum meruit as to the Reservoir project.[13] We disagree.

The defendants argue that the court lacked the discretion to award prejudgment interest under § 37-3a on the plaintiff's claim for quantum meruit. Because this claim requires us to consider the scope of § 37-3a, our review is plenary. "To the extent that the defendant is challenging the applicability of § 37-3a under the circumstances . . . our review is plenary." *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 100, 952 A.2d 1 (2008).

"[T]here is no right to recover interest in a civil action unless a statute provides for interest." *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 737, 682 A.2d 1026, cert.

denied, 239 Conn. 931, 683 A.2d 397 (1996). Section 37-3a (a) provides in relevant part: "[I]nterest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings . . . as damages for the detention of money after it becomes payable. . . ."

"Section 37-3a provides a substantive right that applies only to certain claims. . . . Under § 37-3a, an allowance of prejudgment interest turns on whether the detention of the money is or is not wrongful under the circumstances. . . . There are well established propositions that § 37-3a provides for interest on money detained after it becomes due and payable, that the question under that statute is whether the money was wrongfully withheld . . . . The statute, therefore, applies to claims involving the wrongful detention of money after it becomes due and payable. . . . To award § 37-3a interest, two components must be present. First, the claim to which the prejudgment interest attaches must be a claim for a liquidated sum of money wrongfully withheld and, second, the trier of fact must find, in its discretion, that equitable considerations warrant the payment of interest."[14] (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Reyes* v. *Chetta*, 143 Conn. App. 758, 770, 71 A.3d 1255 (2013). "[P]rejudgment interest for money detained after it becomes due is compensatory because it compensates or reimburses plaintiffs for the interest they could have earned on the money that was rightfully theirs, but that was not paid when it became due." (Internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, supra, 288 Conn. 102 n.36. "Detention of money may be wrongful even if a party had a good faith basis for nonpayment." *Nation Electrical Contracting, LLC* v. *St. Dimitrie Romanian Orthodox Church*, 144 Conn. App. 808, 820, 74 A.3d 474 (2013).

"When a debtor knows precisely how much he is to pay and to whom he is to pay it, his debt is a liquidated one. . . . An amount claimed to be due is a liquidated sum when it is susceptible of being made certain in amount by mathematical calculations from factors which are or ought to be in the possession or knowledge of the party to be charged. . . . Unliquidated damages, on the other hand, are those which are not yet reduced to a certainty in respect to amount, nothing more being established than the plaintiff's right to recover; or such as cannot be fixed by a mere mathematical calculation from ascertainable data in the case." (Citations omitted; internal quotation marks omitted.) *Costello* v. *Hartford Institute of Accounting, Inc.*, 193 Conn. 160, 165–66, 475 A.2d 310 (1984).

"Prejudgment interest pursuant to § 37-3a has been applied to breach of contract claims for liquidated damages, namely, where a party claims that a specified sum under the terms of a contract, or a sum to be determined

by the terms of the contract, owed to that party has been detained by another party. . . . It has also been applied to breach of contract claims where the partial performance of one party caused the other party specific damages . . . . [Section] 37-3a [is] inapplicable to claims for punitive damages because those damages do not become payable before judgment. . . . Personal injury claims seek to make persons whole by monetarily compensating them for a loss negligently caused by others. Damages are typically uncertain and the purpose of the damages is to restore the injured, as nearly as money can, to the status they were enjoying and would have continued to enjoy prior to the negligent act. Such claims do not seek to regain money detained by another." (Citations omitted; footnotes omitted.) *Foley* v. *Huntington Co.*, supra, 42 Conn. App. 740–42.

In *Nation Electrical Contracting, LLC* v. *St. Dimitrie Romanian Orthodox Church*, supra, 144 Conn. App. 820, we declined the defendant's invitation to create a rule disallowing interest under § 37-3a in an action seeking damages for unjust enrichment. In that case, the defendant entered into a contract with a general contractor for the construction of a church, and the general contractor retained the plaintiff subcontractor to provide electrical work. Id., 810. The plaintiff had not entered into a contractual agreement with the defendant. Id. The plaintiff submitted invoices to the general contractor which, in turn, submitted invoices to the defendant, which invoices included the sums sought by the plaintiff. Id. The defendant did not pay the general contractor fully and made no direct payments to the plaintiff. Id., 811. The plaintiff brought an action against the defendant claiming, inter alia, unjust enrichment. Id., 811–12. The trial court concluded that the defendant was liable to the plaintiff for unjust enrichment and awarded damages, prejudgment interest, and costs. Id., 814. On appeal, we concluded that "[the] matter falls squarely within the scope of § 37-3a" and reasoned that the defendant received an invoice for payment from the general contractor that included work performed by the plaintiff and that the amounts were due and owing to the plaintiff. Id., 820–21.

*Nation Electrical Contracting, LLC*, demonstrates the existence of factual scenarios wherein statutory prejudgment interest is appropriate in claims seeking restitution. The defendants have not provided a compelling argument for disallowing statutory prejudgment interest in an action seeking damages in quantum meruit, and we see no reasonable distinction between claims sounding in unjust enrichment and those sounding in quantum meruit for purposes of § 37-3a. "[B]oth unjust enrichment and quantum meruit are doctrines allowing recovery on the theory of restitution, that is, the restoration to a party of something of which he was deprived because of the unjust enrichment of another at his expense. . . . [U]njust enrichment has been the

form of action commonly pursued in this jurisdiction when the benefit that the enriched party receives is either money or property. . . . The other form of action for restitution is quantum meruit, which has been utilized when the benefit received was the work, labor, or services of the party seeking restitution." (Citations omitted; internal quotation marks omitted.) *Schirmer* v. *Souza*, 126 Conn. App. 759, 765–66, 12 A.3d 1048 (2011). "The measure of damages in restitution is the reasonable value of the benefit to the defendant. . . . Although not directly enforceable under the contract, the contract price is evidence of the reasonable value of the benefit the defendant received from the plaintiff." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Walpole Woodworkers*, *Inc.* v. *Manning*, supra, 307 Conn. 589–90.

In concluding that an award for damages under the doctrine of quantum meruit falls within the scope of § 37-3a, we next turn to whether the court abused its discretion in awarding prejudgment interest under the facts of this case. See *Chapman Lumber, Inc.* v. *Tager*, supra, 288 Conn. 99 ("[t]he decision of whether to grant interest under § 37-3a is primarily an equitable determination and a matter lying within the discretion of the trial court" [internal quotation marks omitted]). In the present case, the court did not abuse its discretion in awarding prejudgment interest under § 37-3a. The quantum meruit claim involved a liquidated sum of money that the defendants had withheld from the plaintiff. The unsigned contract, which the court found Kenneth Olson reviewed and accepted its terms by his conduct, included a payment schedule, and the plaintiff sent invoices to the Olsons for $23,907.70 for the services it had provided. In its complaint, the plaintiff sought damages for the nonpayment of $23,907.70 that it was owed for services rendered. The defendants did not pay the plaintiff. The court found that Kenneth Olson intentionally misled Crosskey into providing architectural services and then recast their arrangement as being " 'on spec.' " The court awarded prejudgment interest on the damages for the Reservoir project, beginning on December 31, 2008, thirty days after the final invoice. Under the facts of this case, the amount claimed to be due could be fixed by a mathematical calculation from ascertainable data. See *Costello* v. *Hartford Institute of Accounting, Inc.*, supra, 193 Conn. 165–66. The court's findings as to the Reservoir project support a conclusion that the money was due and payable, and the defendants do not challenge the court's implicit finding that the money was wrongfully detained. We conclude, therefore, that the court did not abuse its discretion in awarding prejudgment interest on the quantum meruit claim as to the Reservoir project.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The original complaint also named One Morningside Drive Partners,

Limited Partnership as a defendant. The action was later withdrawn as to that defendant.

[2] Kenneth M. Olson died during the pendency of this appeal, and Pamela Olson filed a motion to substitute party, which was granted. For ease of reference, we will refer to the individual defendants as Richard Olson or Kenneth Olson or, collectively, as the Olsons.

[3] Although § 37-3a was the subject of technical amendments in 2018; see Public Acts 2018, No. 18-94, § 32; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[4] The record reflects that Crosskey sent Kenneth Olson a signed proposal for the Capehart project and Kenneth Olson signed it.

[5] Although the court found, as to count ten of the operative complaint, that only POKO Partners, LLC, Capeheart Ventures, LLC, and POKO Cape Loom Managers, LLC, breached the contract, the complaint alleged that POKO Management Corp. also breached the contract.

[6] The plaintiff argues that it is unnecessary to review the piercing of the corporate veil claim because the court found the Olsons directly liable on the first, fifth, seventh and tenth counts. We do not agree with the plaintiff's interpretation of the trial court's decision. The question of whether the Olsons were directly liable for damages on the first, fifth, seventh and tenth counts was not before the trial court. The allegations in the complaint did not seek to impose direct liability on the Olsons, and only the thirteenth count of the complaint sought to impose liability for business debts on the Olsons by piercing the corporate veil. The court concluded that the plaintiff met its burden of establishing that the corporate veil should be pierced and, as a result, found that the Olsons were personally liable. Accordingly, we will review this claim.

[7] The instrumentality rule and the identity rule also apply to the protection afforded by a limited liability company. *Morris* v. *Cee Dee, LLC*, 90 Conn. App. 403, 414, 877 A.2d 899, cert. granted, 275 Conn. 929, 883 A.2d 1245 (2005) (appeal withdrawn March 13, 2006).

[8] The remaining prongs of the instrumentality rule, which are not implicated in this claim, are as follows: "(2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 232, 990 A.2d 326 (2010).

[9] The defendants further argue that evidence was presented at trial that POKO Reservoir Yaremich Developers, LLC, Capehart Ventures, LLC, and Cape Loom Managers, LLC, filed and maintained records with the Secretary of State, maintained a separate bank account, and filed tax returns. The court did not state in its memorandum of decision whether it found this evidence credible. If the defendants wanted to have the court specify whether it found this evidence credible, they could have requested an articulation on those grounds. See Practice Book § 66-5.

[10] The court further found that Kenneth Olson's deposition testimony "smacks of elusive game playing semantics" and that the lack of clarity in certain aspects of his testimony indicated that he was attempting to insulate the main defendant entities, as well as himself, from liability.

[11] The defendants argue that the court's finding that single purpose entities were used to absorb liabilities was clearly erroneous. The court determined that the "establishment of 'single purpose entities,' while not nefarious in and of [itself], in this case was used to absorb liabilities, which the entity, specifically, POKO Reservoir Yaremich Developers, LLC, and Capehart Ventures, LLC, did not originally enter into." This finding is supported by the court's additional findings. The court found that Kenneth Olson and POKO Partners, LLC, "do not dispute that they procured architectural services from Crosskey at the outset of [the Reservoir and Capehart] projects, but claim that upon the establishment of a 'single purpose entity' like POKO Reservoir Yaremich Developers, LLC, and Capehart Ventures, LLC, the entities, as opposed to POKO Partners, LLC, under whose auspices [the] court finds solicited Crosskey's services, would begin assuming liability for bills associated with the project. This arrangement was effective, according to [Kenneth] Olson, even though, as Crosskey testified, the plaintiff's services were typically 75 percent complete by the time the single purpose entity was formed." The court also found that after the plaintiff sent invoices regarding the Reservoir project, Kenneth Olson stated that he and his brother

" 'would remain open-minded' " on the issue of the payment dispute, and approximately one month later, POKO Reservoir Yaremich Developers, LLC, was dissolved.

[12] The court found that the plaintiff had proven its claim of quantum meruit against POKO Partners, LLC, POKO Management Corp., and POKO Reservoir Yaremich Developers, LLC, and against the Olsons by virtue of piercing the corporate veil.

[13] See footnote 12 of this opinion.

[14] In *Travelers Property & Casualty Co.* v. *Christie*, 99 Conn. App. 747, 765 n.13, 916 A.2d 114 (2007), we stated that "[w]e have found one contrary case as to the lack of a need for a liquidated sum in order to obtain . . . § 37-3a interest, penned in the early years of the twentieth century. *Loomis* v. *Gillett*, 75 Conn. 298, 53 A. 581 (1902). Although the case has never been overruled, it has never been cited for the proposition that prejudgment interest is appropriate when damages are unliquidated. We conclude that the reasoning of that case has not been adopted in cases decided after 1902."